**KIRKPATRICK & LOCKHART**
**PRESTON GATES ELLIS LLP**
599 Lexington Avenue
New York, New York 10022-6030
Phone: (212) 536-3900
Fax: (212) 536-3901

One Newark Center, Tenth Floor
Newark, New Jersey 07102
Phone: (973) 848-4000
Fax: (973) 848-4001

John M. Marmora (JD-1343)
*Attorneys for McDonald's Corporation,*
*defendant/counterclaim-plaintiff*

-----------------------------------------------------------------X
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK    Civil Action No. 07 CV 5700 (SCR)
-----------------------------------------------------------------X

HYDRIC, INC.,                   ECF CASE

          Plaintiff,

                              **VERIFIED ANSWER,**
   v.                      **AFFIRMATIVE DEFENSES,**
                              **AND COUNTERCLAIM**

MCDONALD'S CORPORATION,

          Defendant.        Document Filed Electronically
-----------------------------------------------------------------X

    MCDONALD'S CORPORATION, as defendant/counterclaim-plaintiff herein

and a Delaware corporation having its principal office at One McDonald's Plaza, Oak

Brook, Illinois ("McDonald's"), by and through its attorneys, Kirkpatrick & Lockhart

Preston Gates Ellis LLP, files this Answer, Affirmative Defenses, and Counterclaim, in

response to the Complaint filed by HYDRIC, INC. ("Hydric") as plaintiff/counterclaim-

defendant, and hereby states:

## AS TO BACKGROUND

1.  McDonald's admits that Hydric filed a declaratory judgment action seeking to invalidate a certain option (the "Purchase Option") to acquire a parcel of real estate (the "Premises") currently occupied by McDonald's pursuant to a lease entered in 1976 with Hydric's processor in title, which parcel lies within a larger property now owned by Hydric (the "Property"). McDonald's denies the balance of the allegations in Paragraph 1 of the Complaint, except to admit that it currently occupies the Premises pursuant to that certain "Groundlease" dated June 8, 1976, a certain "Supplement – Legal Description and Parking Easement" also dated June 8, 1976, a certain "Agreement" dated May 23, 1977, a certain "Agreement" dated May 30, 1980, and a certain "Declaration of Covenants and Restrictions" dated January 27, 1981 (collectively, the "Lease"), all of which were entered between McDonald's then wholly-owned subsidiary and predecessor in title, Franchise Realty Interstate Corp. ("FRIC"), and Hydric's predecessor in title, Howard Miller (the "Original Landlord").

2.  McDonald's admits that it timely exercised its rights under the Purchase Option, but neither admits nor denies the allegations of Paragraph 2 of the Complaint to the extent they make reference to any portion of the Purchase Option or the Lease; rather, McDonald's refers to the documents themselves for the terms and provisions thereof. McDonald's denies the balance of the allegations of Paragraph 2 of the Complaint.

3.  McDonald's denies the allegations of Paragraph 3 of the Complaint.

## AS TO THE FIRST COUNT

4.  McDonald's admits the allegations of Paragraph 4 of the Complaint.

5.  McDonald's admits the allegations of Paragraph 5 of the Complaint.

2

6. McDonald's admits that it transacts business in the State of New York. McDonald's denies the balance of the allegations of Paragraph 6 of the Complaint.

7. McDonald's admits the allegations of Paragraph 7 of the Complaint.

8. McDonald's admits the allegations of Paragraph 8 of the Complaint.

9. McDonald's neither admits nor denies the allegations of Paragraph 9 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same, except to admit that it McDonald's is the lawful successor to the lessee's interest under the Lease.

10. McDonald's neither admits nor denies the allegations of Paragraph 10 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same.

11. After reasonable investigation, McDonald's is without information or knowledge sufficient to form a belief as to truth of the allegations contained in paragraph 11 of the Complaint and, therefore, neither admits or denies same.

12. McDonald's admits the allegations of Paragraph 12 of the Complaint.

13. McDonald's neither admits nor denies the allegations in Paragraph 13 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same, except to admit that certain governmental and quasi-governmental approvals were required for McDonald's installation of the necessary site improvements, and construction and operation of its restaurant on the Premises.

14. McDonald's neither admits nor denies the allegations in Paragraph 14 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof.

15. McDonald's neither admits nor denies the allegations in Paragraph 15 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof.

16. McDonald's neither admits nor denies the allegations in Paragraph 16 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same.

17. McDonald's neither admits nor denies the allegations in Paragraph 17 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same.

18. McDonald's denies the allegations of Paragraph 18 of the Complaint.

19. McDonald's neither admits nor denies the allegations in Paragraph 19 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same. McDonald's also specifically denies the assertion that the Lease was "for a potentially infinite duration at the outset."

20. McDonald's denies the allegations in Paragraph 20 of the Complaint.

21. McDonald's neither admits nor denies the allegations in Paragraph 21 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same.

4

22. McDonald's neither admits nor denies the allegations in Paragraph 22 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same.

23. McDonald's neither admits nor denies the allegations in Paragraph 23 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same.

24. McDonald's neither admits nor denies the allegations in Paragraph 24 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same, except to affirm that it holds a valid and enforceable Purchase Option pursuant to the Lease.

25. McDonald's neither admits nor denies the allegations in Paragraph 25 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same, except to affirm that it is validly in possession of the Premises pursuant to the Lease and Purchase Option. McDonald's further specifically denies that term of the Lease was "potentially infinite."

26. McDonald's neither admits nor denies the allegations in Paragraph 26 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact,

McDonald's denies same, except to affirm that Section 15 of the Lease grants McDonalds, as lessee, certain rights to extend the Lease term.

27. McDonald's neither admits nor denies the allegations in Paragraph 27 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same, except to affirm that it holds a valid and enforceable Purchase Option pursuant to the Lease.

28. McDonald's neither admits nor denies the allegations in Paragraph 28 of the Complaint, but refers to its April 3, 2007 letter and the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same, except to affirm that it timely and properly exercised its valid and enforceable Purchase Option pursuant to the Lease.

29. Except to admit that the document attached to the Complaint as Exhibit D was sent by Hydric, McDonald's neither admits nor denies the allegations in Paragraph 29 of the Complaint, but refers to Hydric's referenced letter itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same. McDonald's specifically denies that Hydric had any legal, equitable, or other right to reject McDonald's exercise of the Purchase Option.

30. McDonald's neither admits nor denies the allegations in Paragraph 30 of the Complaint, which is an assertion of a legal conclusion rather than an allegation of fact. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same.

31. McDonald's neither admits nor denies the allegations in Paragraph 31 of the Complaint, but refers to the Lease document itself for the terms and provisions thereof. To the extent the allegations in this paragraph may be construed as allegations of fact, McDonald's denies same, except to affirm that the purchase price for the Premises pursuant to the Purchase Option is $165,000, as agreed upon by the original landlord and McDonald's predecessor, and as both implicitly and explicitly accepted by Hydric when it acquired the Property in 1994 subject to the Lease and Purchase Option.

32. McDonald's denies the allegations in Paragraph 32 of the Complaint.

33. After reasonable investigation, McDonald's is without information or knowledge sufficient to form a belief as to truth of the allegations contained in paragraph 33 of the Complaint and, therefore, neither admits or denies same. McDonald's further denies that there is any legal or equitable infirmity with respect to the Purchase Option, or that the present value of the Premises is relevant to the issues herein.

34. McDonald's denies the allegations in Paragraph 34 of the Complaint. McDonald's further refers to the fundamental inconsistency of Hydric's allegations in this Paragraph 34 as compared to its allegations in Paragraph 11: While Hydric asserts that McDonald's Lease and Purchase Option represent "a serious and unreasonable interference with the alienability of the Property," Hydric simultaneously admits and alleges – as it must under the facts of this case – that the original landlord "freely alienated the Property" when Hydric acquired it in 1994 subject to the terms and conditions of McDonald's Lease and Purchase Option.

35. McDonald's denies the allegations of paragraph 35 of the Complaint.

36. McDonald's denies the allegations in Paragraph 36 of the Complaint. McDonald's further refers to the fundamental inconsistency of Hydric's allegations in this Paragraph 36 as compared to its allegations in Paragraph 11: While Hydric asserts that McDonald's Lease and Purchase Option "contravenes the public policy of favoring the free transfer of property," Hydric simultaneously admits and alleges – as it must under the facts of this case – that the original landlord "freely transferred the Property" when Hydric acquired it in 1994 subject to the terms and conditions of McDonald's Lease and the Purchase Option.

37. McDonald's denies the allegations in Paragraph 37 of the Complaint. McDonald's further refers to the fundamental inconsistency of Hydric's allegations in this Paragraph 37 as compared to its allegations in Paragraph 11: While Hydric asserts that McDonald's Purchase Option "constitutes a substantial and invalid curtailment on the alienability of the Property," Hydric simultaneously admits and alleges – as it must under the facts of this case – that the original landlord "freely alienated the Property" when Hydric acquired it in 1994 subject to the terms and conditions of McDonald's Lease and the Purchase Option.

38. McDonald's denies the allegations in Paragraph 38 of the Complaint.

39. McDonald's denies the allegations in Paragraph 39 of the Complaint. McDonald's further refers to the fundamental inconsistency of Hydric's allegations in this Paragraph 39 as compared to its allegations in Paragraph 11: While Hydric asserts that McDonald's Lease and Purchase Option represent "a serious and unreasonable restraint upon the alienability of the Property," Hydric simultaneously admits and alleges – as it must under the facts of this case – that the original landlord "freely alienated the

Property" when Hydric acquired it in 1994 subject to the terms and conditions of McDonald's Lease and the Purchase Option.

**WHEREFORE,** McDonald's, as defendant and counterclaim-plaintiff, respectfully requests that the complaint of Hydric be dismissed in its entirety, with prejudice and with attorneys' fees and costs of suit assessed.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Hydric's Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Hydric's Complaint is barred by the applicable statute of limitations.

### THIRD AFFIRMATIVE DEFENSE

Hydric's Complaint is barred by the doctrine of laches.

### FOURTH AFFIRMATIVE DEFENSE

Hydric is barred from the relief sought in its Complaint by the equitable doctrines of estoppel, waiver and/or unclean hands.

### FIFTH AFFIRMATIVE DEFENSE

Hydric is estopped from asserting the Lease had potentially infinite duration because the Lease term had been established and confirmed prior to Hydric's acquisition of the Property, and was subsequently confirmed by letter agreement between McDonald's and Hydric.

## SIXTH AFFIRMATIVE DEFENSE

Hydric is barred from seeking the relief sought in its Complaint by reason of the fact that any injury or inequity it alleges is the result of its own conscious decisions and actions when it freely acquired the property in 1994 subject to the terms of the Lease and Purchase Option.

## SEVENTH AFFIRMATIVE DEFENSE

Hydric is barred from seeking the relief sought in its Complaint by reason of the fact that the terms of the Lease and Purchase Option were negotiated in an arms-length business transaction between sophisticated parties taking into account, among other things, the rental rate, duration of term, and appreciation in value to the original landlord's surrounding properties when enhanced by the site improvements and restaurant McDonald's was to build (and subsequently did build) at its sole cost; hence, Hydric lacks any legal, equitable or factual basis to allege – some thirty years after the conclusion of the subject negotiations in which it admittedly had no involvement – that one term out of a multitude served no "reasonable or compelling business purpose."

## EIGHTH AFFIRMATIVE DEFENSE

Hydric admits to the free alienability of the Property in its allegation in Paragraph 11 of the Complaint that it acquired the Property from the Original Landlord under the Lease; hence, Hydric cannot now allege facts sufficient in law or equity to establish an unreasonable restraint upon alienation.

## NINTH AFFIRMATIVE DEFENSE

Because Hydric freely purchased the Property subject to the Lease and Purchase Option, Hydric is further barred by the doctrine of estoppel from now contending that the Purchase Option constitutes an unreasonable restraint upon alienation.

## TENTH AFFIRMATIVE DEFENSE

Because Hydric freely purchased the Property subject to the Lease and Purchase Option, Hydric is barred by the doctrine of waiver from now alleging that the Purchase Option constitutes an unreasonable restraint upon alienation.

## ELEVENTH AFFIRMATIVE DEFENSE

Hydric is barred from seeking the relief requested in the Complaint by the doctrine of unjust enrichment.

## TWELFTH AFFIRMATIVE DEFENSE

Hydric is barred from seeking the relief requested in the Complaint because it is attempting to reap a financial windfall at McDonald's expense.

## RESERVATION

To the extent that additional affirmative defenses are discovered during the course of the litigation, Defendant reserves the right to plead the additional affirmative defenses.

**WHEREFORE,** McDonald's, as defendant and counterclaim-plaintiff, respectfully requests that the complaint of Hydric be dismissed in its entirety, with prejudice and with attorneys' fees and costs of suit assessed, including "attorneys fees and disbursements" pursuant to Section 23F of the Lease.

11

## COUNTERCLAIM

McDonald's, as counterclaim-plaintiff, by way of counterclaim against Hydric, as counterclaim-defendant, hereby alleges and states as follows:

### NATURE OF THIS ACTION

1.    Defendant/counterclaim-plaintiff McDonald's Corporation ("McDonald's") initiates this counterclaim to enforce a certain purchase option described above and further identified hereinbelow (the "Purchase Option") which affects a delineated tract of real property (the "Premises") within a larger tract owned by plaintiff/counterlcaim-defendant Hydric, Inc. ("Hydric") at 566 Albany Post Road (a/k/a Route 9) and commonly known as Park Plaza Shopping Center (the "Property"). McDonald's currently operates a restaurant within a building it constructed on the Premises and subsequently maintained entirely at its own expense for over thirty years. McDonald's also seeks monetary and related ancillary relief resulting from Hydric's past and continuing refusal to honor its obligations under the Purchase Option.

2.    McDonald's claims arise out of a certain lease and related agreements entered between its then wholly-owned subsidiary and predecessor Franchise Realty Interstate Corporation ("FRIC") as lessee, and Harold Miller as lessor (the "Original Landlord"), consisting of the following:

(a)  That certain "Groundlease" dated June 8, 1976, a true copy of which is annexed hereto as Exhibit A (the "Groundlease");

(b)  That certain "Supplement – Legal Description and Parking Easement" also dated June 8, 1976, a true copy of which is annexed hereto as <u>Exhibit B</u> (the "Easement Supplement");

(c)  That certain "Agreement" dated May 23, 1977, a true copy of which is annexed hereto as <u>Exhibit C</u> (the "First Amendment");

(d)  That a certain "Agreement" dated May 30, 1980, a true copy of which is annexed hereto as <u>Exhibit D</u> (the "Second Amendment"); and

(e)  That certain "Declaration of Covenants and Restrictions" dated January 27, 1981, a true copy of which is annexed hereto as <u>Exhibit E</u> (the "DC&R") (collectively, the "Lease").

## **THE PARTIES**

3.  McDonald's is a Delaware corporation having its principal place of business at One McDonald's Plaza, Oak Brook, Illinois.  It is the successor by merger to the interests of FRIC, its former wholly-owned subsidiary.

4.  Upon information and belief, Hydric is a New York corporation with its principal place of business at 54 Garden Street, Poughkeepsie, New York.

5.  Upon information and belief, in 1994 Hydric succeeded to the fee interest of the Original Landlord in the Property, including the interest of lessor under the Lease.

6.  Hydric has been and continues to be the owner of the Property and is thus the lessor under the Lease and contract seller pursuant to the Purchase Option.

## GENERAL ALLEGATIONS

### The Commencement of the Lease

7.      Pursuant to Section 3 of the Groundlease, the original term commenced upon execution and was to extend for a period of 21 years from the date FRIC opened its restaurant on the Premises.  In addition, pursuant to Section 15 of the Lease the lessee was granted two options to extend the term, each for a period of 10 years, both of which were timely and properly executed.  Hence, the term has been extended to September 25, 2018, subject to earlier termination pursuant to the Purchase Option.

8.      Pursuant to the Groundlease and Easement Supplement, the Premises originally was to consist of:

(a) .64 acres fronting on Route 9 for the construction of a restaurant and, together with the easements and other rights described in Section 1 of the Groundlease;

(b) a nonexclusive easement for ingress and egress over the adjacent driveways and drive aisles; and

(c) an exclusive easement for parking within a designated area consisting of approximately .38 acres (which the lessor has the right to incorporate into a larger parking field for the shopping center, subject to the terms, conditions and restrictions therein stated).

9.      At the time the Groundlease and Easement Supplement were entered, there were no improvements on the Premises; rather, it was a vacant, wooded lot.

10.     Accordingly, the Groundlease contemplated that FRIC would pursue the necessary governmental approvals to develop the site and thereafter construct the restaurant

14

and all necessary site improvements. See Sections 2 and 5 of Groundlease [Exhibit A] and Section 1.B. of Lease Supplement [Exhibit B].

11.    The Groundlease further provided that FRIC was to "make diligent application for site plan approval immediately upon execution of this Lease" and could terminate the Lease if the requisite approvals were not obtained. See Sections 5 and 27 of Groundlease [Exhibit A].

12.    A six-month rent abatement was provided for the period of time in which FRIC was to seek the requisite approvals, with an option to extend this for an additional three months at a reduced rental of $450 per month. See Section 2 of Groundlease [Exhibit A].

13.    At the same time, the Groundlease also contemplated that the Original Landlord would ultimately further improve its adjacent lands in accordance with a certain "master plan" which was referenced as an exhibit to be annexed to the Groundlease. See Section 26 of Groundlease [Exhibit A].[1]

14.    FRIC ultimately obtained final approvals from the Town of Hyde Park and received a building permit on February 11, 1977; however, in order to comply with the requirements thereof, the portion of the Premises on which the restaurant building was to be constructed had to be lengthened in depth by 10 feet. This was effectuated by the First Amendment, which expanded this area to .67 acres and set forth the consideration the Original Landlord was to receive in exchange therefor. See Recitals and Sections 1 to 3 of First Amendment [Exhibit C].

15.    Thus, the Premises subject to the Lease -- and by coterminous definition, the property subject to the Purchase Option at issue herein -- consists of (a) the .67 acre tract

---

[1] The "master plan" exhibit is too large to attach to this pleading but will be produced in discovery.

described by metes and bounds as Parcel 1 in the First Amendment, (b) the .38 acre tract described by metes and bounds as Parcel 2 in the First Amendment, and (c) the easements and other rights described in the Groundlease and the Easement Supplement.

16.    FRIC thereafter constructed the restaurant and site improvements, and, on September 26, 1977, opened for business. As set forth above, this then marked the date from which the extension options and termination date was to be measured.

17.    In 1980 FRIC and the Original Landlord entered the Second Amendment, which permitted FRIC to add a drive-through facility. Governmental approvals were thereafter obtained and the facility was constructed. [Exhibit D].

18.    In 1981 FRIC and the Original Landlord entered the DC&R which permitted FRIC to maintain a freestanding sign on Route 9. Governmental approvals were thereafter obtained and the sign was constructed. [Exhibit E].

### Hydric's Acquisition of the Property

19.    Upon information and belief, in 1994 Hydric acquired the property from an entity in which Harold Miller (i.e., the Original Landlord) served as president and general partner. The most current record information indicates that title was transferred to Hydric by deed dated January 2, 1994 and recorded on April 27, 1994 in liber 1943 at cp 406.

20.    There is a notation of page 3 of the aforesaid deed as follows: "Subject to existing tenancies and mortgage." Thus, Hydric is chargeable with record notice of McDonald's tenancy in light of the foregoing, as well as actual notice in light of the fact that McDonald's was in possession and operating its restaurant on the Premises at the time Hydric acquired the Property.

21.     McDonald's had earlier merged FRIC into itself; thus, all dealings regarding the Lease from and after Hydric's acquisition of the Property were directly between the parties to this litigation.

22.     By letter to Hydric dated February 9, 1998, McDonald's confirmed the Lease term and exercised its first option to extend it to September 25, 2008.  Hydric countersigned the letter in confirmation thereof.  A true and complete copy of the aforesaid letter is annexed hereto as Exhibit F.

23.     By letter to Hydric dated March 9, 2007, McDonald's exercised its second option to extend the term, confirming a final expiration date of September 25, 2018. Although McDonald's did not receive a countersigned copy of this letter, McDonald's did receive a Certified Mail Return Receipt evidencing Hydric's receipt of McDonald's March 9, 2007 letter exercising its second option to extend the term of the Lease.  A true and complete copy of the aforesaid letter and Certified Mail Return Receipt is annexed hereto as Exhibit G.

24.     In 2006 Hydric obtained amended site plan approvals from the Town of Hyde Park to construct additional buildings on the Property.  That amended approval calls for a relocation of the area over which McDonald's currently has an exclusive parking easement.  A true and complete copy of the aforesaid amended site plan approval from the Town of Hyde Park is annexed hereto as Exhibit H.

25.     McDonald's never consented to any amendment to its Premises, notwithstanding that its consent is specifically required pursuant to Section 2.A of the Easement Supplement. [Exhibit B]

17

26.    In fact, McDonald's did not even have notice that Hydric was seeking such amended approvals from Hyde Park.

27.    On information and belief, at no time did Hydric advise the reviewing agencies and personnel in Hyde Park of McDonald's Purchase Option.

### McDonald's Exercise Of The Purchase Option

28.    The Groundlease granted lessee the aforementioned Purchase Option, which was an option to acquire "the demised premises for the sum of one hundred sixty-five thousand dollars ($165,000) provided Lessee shall give Lessor notice in writing of its election to exercise said option any time during the original term or any extension or renewal thereof." See Section 17 of Groundlease [Exhibit A].

29.    By letter to Hydric dated April 3, 2007, which was prior to the expiration of the term, as extended, McDonald's served notice of its exercise of the Purchase Option in compliance with the terms of the Lease. A true and complete copy of the aforesaid letter is annexed hereto as Exhibit I.

30.    Hydric rejected McDonald's aforesaid exercise of the Purchase Option and has repudiated it on a number of grounds, including those set forth in the Complaint to which this responds.

31.    In this regard, it is important to note that, as set forth above, the Premises did not include the restaurant building or site improvements; rather, FRIC was to construct the restaurant building at its sole cost. See Section 5.C of Groundlease [Exhibit A] and Section 1.B of Easement Supplement [Exhibit B].

18

32.    The Lease further provided that all such improvements made upon the Premises were to "be and remain the property of Lessee." See Section 9 of Groundlease [Exhibit A].

33.    FRIC not only subsequently developed the site, but for these past thirty years, FRIC and then McDonald's has also maintained and upgraded the restaurant and site improvements at their respective sole expenses.

34.    Thus, Hydric's assertion in Paragraph 33 of its Complaint that the fair market value of the Premises is today "at least 400% greater than the predetermined price" is not only entirely irrelevant, but also extremely misleading in terms of the relative equities involved.

35.    As to Hydric's further assertion regarding the Purchase Option being of "potentially infinite duration," it is important to note that the time Hydric purchased the Premises, the requisite governmental approvals had long since been obtained, the site improvements constructed, the restaurant in operation for over twenty years, and the term expiration date fixed. Accordingly, there were no "unknowns" regarding the Lease or the Purchase Option at the time Hydric succeeded to the Original Landlord's rights and obligations thereunder.

36.    After freely reaping the benefits of the Lease for over thirteen years without saying a word about its view of the validity of the Purchase Option, Hydric's current attempt to fabricate ambiguities in order to deprive McDonald's of its bargained for Purchase Option amounts to little more than an attempt to purchase via the judicial system – and without cost – that for which it did not pay when it acquired the Property in 1994, i.e., a shopping center unencumbered by McDonald's Purchase Option.

19

37.    Moreover, it is apparent that Hydric is not only motivated by a desire to enrich itself at McDonald's expense by improperly and inequitably arrogating to itself the financial benefit of McDonald's bargain – without compensation to McDonald's – but Hydric is also further motivated by a desire to protect the amended site plan approval it obtained in 2006 from Hyde Park without the knowledge or consent of McDonald's.

### Subdivision of Premises

38.    As set forth above, the Premises constitute a portion of Hydric's larger tract; thus, subdivision approval is required before a conveyance in accordance with the terms of the Lease may lawfully occur.

39.    The Premises are located within Hyde Park's "Town Center Historic District" and, on information and belief, meets all of the requisite bulk criteria for subdivision.

40.    In its April 3, 2007 letter, McDonald's informed Hydric that it would be required to execute further documents to process the requisite subdivision application. See April 3, 2007 letter to Hydric [Exhibit I].

41.    Notwithstanding McDonald's proper and timely exercise of the Purchase Option, Hydric refused to honor its obligations thereunder and has not only repudiated its obligations to McDonald's but has also refused to cooperate in any effort by McDonald's to procure subdivision approval.

42.    By letter dated May 5, 2007, Hydric rejected the Purchase Option as "null and void *ab initio* and unenforceable because it violates, inter alia, New York's common law rule against unreasonable restraints on alienation of property." A true and complete copy of the aforesaid letter is annexed hereto as Exhibit J.

43. Hydric had also earlier advised Hyde Park that McDonald's has no authority to pursue the matter without Hydric's consent – which it refuses to grant. A true and complete copy of Hydric's March 2, 2007 letter is annexed hereto as Exhibit K.

44. By letter dated May 9, 2007, McDonald's informed Hydric that the Purchase Option was valid under New York law and that its refusal to honor the Purchase Option constituted a breach of the Lease. A true and complete copy of the aforesaid letter is annexed hereto as Exhibit L. Hydric nonetheless wrongfully continues to fail to honor its obligations under the Purchase Option.

45. Section 3.D of the Easement Supplement [Exhibit B] provides that in the event lessee were to exercise the Purchase Option, all easements contemplated by the Lease were to be made perpetual and memorialized in recordable documents.

46. Accordingly, Hydric is also obligated to provide same to McDonald's in connection with its conveyance of the Premises.

### The Validity of the Purchase Option

47. The terms of the Purchase Option were negotiated in an arms-length business transaction between sophisticated parties taking into account, among other things, the rental rate, lease duration and appreciation in value to the Original Landlord's surrounding properties when enhanced by the site improvements and restaurant McDonald's was to build (and did build) at its sole cost; hence, Hydric lacks any legal, equitable or factual basis to allege – some thirty years after the conclusion of the subject negotiations in which it admittedly had no involvement – that one term out of a multitude served "no reasonable business purpose." Rather, such a purpose can readily be presumed under the circumstances.

48.     Hydric's acquisition of the Property, including all of the Original Landlord's right, title and interest under the Lease and its obligations under the Purchase Option, amply demonstrates that neither constituted an unreasonable restraint on alienation.

49.     Prior to McDonald's exercise of the Purchase Option, Hydric never raised an objection to the existence or terms of the Purchase Option.

50.     McDonald's has at all times dealt with Hydric in good faith and has complied with the terms of the Lease and Purchase Option.

51.     Hydric has acted in bad faith for the sole purpose of improperly depriving McDonald's of its substantial property interest in order to enrich itself.

52.     By reason of Hydric's flagrant disregard of its obligations under the Purchase Option, McDonald's has been and will continue to be irreparably and wrongfully harmed by Hydric's deliberate deprivation of McDonald's right to acquire the demised premises.

## FIRST CAUSE OF ACTION
### (Specific Performance)

53.     McDonald's hereby repeats and re-alleges the allegations set forth in paragraphs 1 through 52 above as if set forth in full herein.

54.     At all times relevant to the matters alleged herein, McDonald's has fully performed all of its obligations under the terms and conditions of the Lease and Purchase Option.

55.     Hydric has improperly breached the Purchase Option and continues to deprive McDonald's of its right to complete the transaction following its exercise of the Purchase Option.

22

56.    Hydric's breach of its obligations under the Purchase Option is wrongful and unexcused.

57.    McDonald's has no adequate remedy at law.

58.    McDonald's thus demands judgment compelling Hydric to specifically perform its obligations under the Purchase Option and convey the demised premises to McDonald's in accordance with the terms thereof.

**WHEREFORE**, McDonald's demands judgment against Hydric:

(a)    Compelling Hydric to immediately and specifically perform its obligation to convey the Premises and all related interests to McDonald's in accordance with the terms of the Lease, including cooperating with the subdivision application and providing all necessary easements;

(b)    Awarding McDonald's attorneys' fees and costs associated with this lawsuit; and

(c)    For such other and further relief as this Court may deem just and equitable.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

59.    McDonald's repeats and re-alleges the allegations set forth in paragraphs 1 through 58 above as if set forth in full herein.

60.    Hydric's continued flagrant disregard of its obligations under the Lease and Purchase Option constitute a material breach thereof.

61.    As a result of Hydric's breach of the Lease and Purchase Option, McDonald's has incurred damages which include, but are not limited to, engineering fees, subdivision attorney's fees, other ancillary costs necessary to subdivide the property, and monthly rent paid by McDonald's since the exercise of the Purchase Option.

**WHEREFORE**, McDonald's demands judgment against Hydric:

(a)     Awarding monetary damages for reimbursement of expenses McDonald's has thus far incurred due to Hydric's breaches, including, but not limited to, engineering fees, professional fees and other ancillary costs necessary to subdivide the property, and all rent payments made by McDonald's since the exercise of the Purchase Option;

(b)     Awarding monetary damages for reimbursement of incidental and consequential damages incurred by McDonald's due to Hydric's breaches; and

(b)     For such other and further relief as this Court may deem just and equitable.

### THIRD CAUSE OF ACTION

### (Breach of Covenant of Good Faith and Fair Dealing)

62.     McDonald's repeats and re-alleges the allegations set forth in paragraphs 1 through 61 above as if set forth in full herein.

63.     Hydric's continued flagrant disregard of its obligations under the Lease and Purchase Option constitute a material breach of its implied covenant of good faith and fair dealing in the performance thereof.

64.     As a result of Hydric's breach of its implied covenant of good faith and fair dealing in the performance of the Lease and Purchase Option, McDonald's has incurred damages which include, but are not limited to, engineering fees, subdivision attorney's fees, other ancillary costs necessary to subdivide the property, and monthly rent paid by McDonald's since the exercise of the Purchase Option.

**WHEREFORE**, the McDonald's demands judgment against Hydric:

(a)     Awarding monetary damages for reimbursement of expenses McDonald's has thus far incurred due to Hydric's breaches, including, but not limited to, professional fees and other ancillary costs necessary to subdivide the property and rent payments made by McDonald's since the exercise of the Purchase Option;

(b)     Awarding monetary damages for reimbursement of incidental and consequential damages incurred by McDonald's due to Hydric's breaches; and

(b)     For such other and further relief as this Court may deem just and equitable.

## FOURTH CAUSE OF ACTION

### (Attorney's Fees Per Lease)

65.     McDonald's repeats and re-alleges the allegations set forth in paragraphs 1 through 64 above as if set forth in full herein.

66.     Pursuant to Section 23.F of the Groundlease [Exhibit A] the prevailing party in any litigation relating to the provisions thereof is entitled to recover "reasonable expenses of attorneys' fees and expenses" from the other party.

**WHEREFORE**, the McDonald's demands judgment against Hydric:

(a)     Awarding monetary damages for reimbursement of all "reasonable expenses of attorneys fees and expenses" in accordance with the Lease; and

(b)     For such other and further relief as this Court may deem just and equitable.

## CERTIFICATION

I hereby certify that the within Answer, Affirmative Defenses and Counterclaim have been served within the time prescribed by the Rules of Court or extended by agreement of the parties or Order of the Court.

**KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP**
*Attorneys for McDonald's Corporation,
defendant-counterclaim plaintiff*

BY:    _s/ John M. Marmora_____
John M. Marmora (JD-1343)
One Newark Center, Tenth Floor
Newark, NJ 07102
Tel: (973) 848-4000
Fax: (973) 848-4001
E-mail: john.marmora@klgates.com

Dated: June 13, 2007

## VERIFICATION

**CITY OF NEWARK**                              :
                                                : SS.:
**STATE OF NEW JERSEY**                         :


Carol DeMarco, being duly sworn, deposes and states that she is an Asset Manager of McDonald's USA, LLC, a wholly owned subsidiary of McDonald's Corporation ("McDonald's"), plaintiff in the above matter; she has read the foregoing Answer, Affirmative Defenses and Counterclaim and knows the contents thereof; the contents are true to her own knowledge except as to matters therein stated to be alleged upon information and belief or based upon the contents of written agreements, to which she believes those matters to be true. This verification is made by the deponent because McDonald's is a corporation acting through its officers and agents and the deponent is an agent of a wholly owned subsidiary thereof; that the source of deponent's knowledge and the grounds for deponent's belief as to all matters in said Answer, Affirmative Defenses and Counterclaim are the result of an investigation which she caused to be made concerning the subject matter of this action and information acquired by her in the course of her duties as an employee of McDonald's USA, LLC.

*Carol DeMarco*
_____
CAROL DEMARCO


Sworn to before me this
*13TH* day of *June*, 2007

*Lorraine Brown*
_____
Notary Public

LORRAINE BROWN
A Notary Public Of New Jersey
My Commission Expires 3/9/2008

# EXHIBIT A

McDonald's ®                    **GROUND LEASE**                    McDonald's ®

THIS LEASE is made and entered into this _____ 5 _____ day of ___June_____,
19 _76_ by and between _____Harold Miller_____,
_____ of the City of _____Poughkeepsie_____,
County of _Dutchess_____, State of _____New York_____
X~~xxxxxxxx~~ ~~xxxxxxxxxxxxxxxxxxxxxxxxxxx~~, hereinafter called
~~xxxxxx~~ "Lessor" and ___Franchise Realty Interstate Corporation_____,
a _____corporation, hereinafter called "Lessee":

1.    *PREMISES:* Lessor, for and in consideration of the covenants hereinafter contained and made on the part of the Lessee, does hereby demise and lease unto Lessee, and Lessee does hereby lease from Lessor, the parcel of land which is located in _the Town of Hyde Park_____,
County of _Dutchess_____, State of _____New York_____,
having a frontage of not less than _____135 +_____ feet on __Route 9_____
_____, containing not less than __64 + acres_____
~~square feet~~, not including roads or public right of ways, being more particularly described on page 1A attached hereto and made a part hereof, together with all Lessor's easement rights and appurtenances thereto, all buildings and improvements now located thereon, and all necessary easements and appurtenances in Lessor's adjoining and adjacent land, highways, roads, streets, lanes, whether public or private, reasonably required for the installation, maintenance, operation and service of sewers, water, gas, drainage, electricity and other utilities and for drive-ways and approaches to and from abutting highways for the use and benefit of the above described parcel of real estate, including the improvements to be erected thereon. If Lessee has the demised premises surveyed, then, at Lessee's option, the parties shall execute a recordable amendment by which a survey description shall be inserted herein in lieu of the description contained on page 1A, but Lessee shall not be obligated to lease less than is described above. Notwithstanding the aforesaid, Lessee shall have no rights in Lessors adjacent lands unless specifically set forth herein.

2.    *PERMITS:* Lessee has entered into this lease in the expectation of obtaining, after expiration of all applicable appeal periods, all permits, licenses, permissions, and/or other authorizations (hereinafter collectively called "Permits") necessary for the construction upon the demised premises of a complete McDonald's restaurant facility, built according to Lessee's plans and specifications (including without limitation septic tank(s) and/or sewer disposal system(s), if necessary, parking area(s), ~~chimney(s)~~, sign(s), and any other improvement(s) in connection with said facility deemed necessary or desirable by Lessee), and for the operation of said facility upon the demised premises seven (7) days a week. Lessee agrees to apply for permits without unreasonable delay after the execution hereof. Lessee may (but shall not be obligated to) cancel this lease if after first application therefore, permits are denied or are not obtained within one hundred twenty (120) days.

3.    *LEASE TERM:* Lessee shall have and hold the demised premises for a term commencing on the date of last execution hereof and ending twenty (21) years from the date upon which said McDonald's Restaurant is opened for business to the public. When the term hereof is ascertainable and specifically fixed, or otherwise agreed to by Lessor and Lessee, Lessor and Lessee shall enter into a supplement, suitable for recording, which shall specify the actual date for the expiration of the original term of this Lease and for the commencement of accrual of rent payable hereunder by Lessee. Notwithstanding the term as defined herein, Lessee shall have six (6) months in which to obtain all municipal approvals without liability for rent. At the option of Lessee, an additional period of three (3) months shall be *

4.    *RENT:* Lessee's liability for rent shall commence to accrue on the date when the ** McDonald's Restaurant ~~open for business~~ is granted site plan approval, subject to ~~herewith~~ the provisions of paragraph "5" of this lease.

~~Lessee covenants and agrees to pay to Lessor as rent for said demised premises the sum of~~
_____TEN THOUSAND EIGHT HUNDRED_____
DOLLARS ($ _10,800.00-------------------_)per annum payable as follows: In equal monthly installments of ___NINE HUNDRED----------------------------------
DOLLARS ($ _900.00---------------------_) per month, payable one each on the 15th day of every calendar month for the then current month. In the event that that commencement date of said rent shall be on a day other than the first day of the month, the first rental payment and last rental payment, if applicable, shall be adjusted for the proportionate fraction of the whole month. For the eleventh (11th) through fifteenth (15th) year the rent shall $12,420. annually, payable in equal monthly installments. For the sixteenth 6th) through twenty-first (21st) year, the rent shall be $13,351.50, annually, payable in equal monthly installments.

granted by Lessor for such purpose provided Lessee pay $450 per month as rent til final approval is received whereupon full rent shall be due and payable rsuant to the terms of paragraph "4".

when all contingencies of the Lease, including paragraph "5", have been satisfied.

-1-

McD-GL-5/75

May 26, 1976

## PORTION OF THE LANDS OF HAROLD MILLER

Beginning at a point in the easterly line of Route 9 the said point being the northwesterly

corner of the herein described parcel and being S 1° 03'50" E 83.64' from the northwesterly

corner of lands of Harold Miller and the southwesterly corner of lands of Joseph H. Mesuda;

thence thru the lands of Harold Miller along the northerly line of the herein described parcel

S 88° 08'50" E 210.19' to the northeasterly corner of the herein described parcel being a

point in the westerly line of a future interior access road running in a north – south

direction within the proposed shopping center; thence still thru the lands of Harold Miller

along the easterly line of the herein described parcel along the westerly line of the above

mentioned future interior access road S 1° 03'50" E 130.00' to the southeasterly corner of

the herein described parcel being the point of intersection of the westerly line of the

above mentioned future interior access road with the northerly line of a future entrance

road from Route 9; thence still thru the lands of Harold Miller along the southerly line of

the herein described parcel along the northerly line of the future entrance road from

Route 9 following in part a portion of existing curb N 89° 30'40" W 184.94' and along

a curve to the right on a radius of 30.00' a distance of 30.38' to the southwesterly

corner of the herein described parcel being the point of intersection of the northerly line

of the abovementioned entrance road with the easterly line of Route 9; thence along the

westerly line of the herein described parcel along the easterly line of Route 9

N 1° 03'50" W 120.89' to the point or place of beginning and containing 0.64 acres

more or less.

Subject to a water line easement 10' in width granted to the Hyde Park Fire and Water

District, the location of said easement being shown on the accompanying plan.

Together with the parking rights as is set forth on Rider A
attached hereto and made a part hereof.

CONDITIONS OF LESSEE'S PERFORMANCE: The parties agree that the following shall be conditions of the Lease and in the event any of such conditions are lacking or cannot be provided at reasonable cost to Lessee, this lease, at Lessee's option shall terminate and be null and void.

~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX Lessee hereby covenants, represents~~
~~XXXXXXXXXXXXXXXX~~
                                        assist lessee, at lessee's cost and expense to
A.    That Lessor shall, if necessary, use its best efforts to obtain the approval of all public or governmental authorities as to all matters relating to zoning, subdivision, lot splits, special use permits or similar requirements for use of the demised premises as a McDonald's Restaurant in accordance with Lessee's plans and specifications as will permit the Lessee to obtain all necessary permits, licenses and approvals referred to in Article 2 above; ~~and that Lessor shall pay and bear all costs for any offsite improvements and dedicate any easements required by any public authority as a condition to the granting of any approval.~~ Lessor and Lessee will equally bear the cost of paving access roads to the south and east of the demised premises according to a certain Master Plan of lands of Lessor annexed. Lessor shall maintain such roads.
B.    That all water ~~and gas~~ mains, electric power lines, ~~sanitary~~ and storm sewers are located at the property line, in the public right-of-way, of the demised premises and are available and adequate for Lessee's intended use; ~~or, if the same are not available and adequate, Lessor agrees to extend utilities meeting Lessee's specifications to the demised premises within thirty (30) days from the date Lessee notifies Lessor that all necessary permits and approvals have been obtained and~~ Lessee delivers its plans and specifications therefore.  SEE page "2A"
C*
~~C.   That Lessor shall demolish and remove all existing improvements, encroachments, signs and underground storage tanks, if any, located on the demised premises and shall fill, grade, compact and construct retaining walls to Lessee's specifications required by Lessee to make the demised premises ready for the construction of Lessee's improvements, all of which shall be completed within thirty (30) days from the date that Lessee notifies Lessor that all necessary permits and approvals have been obtained and Lessee delivers its plans and specifications therefore.~~ Lessee shall erect retaining wall at north end of premises, shall protect existing shrubbery, and replace the same if destroyed by construction.
D.    That the demised premises are free and clear of all tenancies, whether oral or written, and that Lessee shall have sole and actual possession from the date of execution hereof. All located at said north end of premises.
E.    That Lessor shall pay, bear, and discharge all future real estate taxes and special assessments charged or imposed upon the demised premises or any improvements erected thereon by Lessee, or anyone claiming by, through, or under it, or upon the owner or occupier in respect thereof during the term of this lease or any extension thereof and to deliver promptly to Lessee at all times proper and sufficient receipts and other evidence of the payment and discharge of the same. This provision shall apply until Lessee receives its certificate of occupancy, but no later than June 1977, whereupon Lessee shall pay all such taxes and charges. If partial construction results in increased taxes, Lessee shall pay such**
Lessor hereby acknowledges that Lessee is relying upon said covenants, representations and conditions~~warranties~~ in executing this Lease and that matters is expressly~~so expressed and~~ warranted are material ones. Lessor, accordingly, agrees that any/breach~~or warranty~~ of this representation shall be grounds for Lessee to elect, at its option, to terminate this Lease or cure ~~Lessor's default(s)~~ and deduct its costs to cure said defaults from rent thereafter accruing. These remedies are in addition to all other ~~remedies Lessee may have in law or equity.~~
    Lessee agrees to furnish Lessor with copies of all tax receipts within forty-five (45) days after such tax is due without penalty.

6.    LIENS AND ENCUMBRANCES: Subject to paragraphs 10, 11 and 21 herein, Lessee covenants not to suffer the estate of Lessor in the demised premises at any time during the said term to become subject to any lien, charge, or encumbrance whatsoever, and to indemnify and keep indemnified Lessor against all such liens, charges and encumbrances; it being expressly agreed that Lessee shall have no authority, expressed or implied, to create any lien, charge, or encumbrance upon the estate of Lessor in the demised premises. Lessee shall, upon demand of Lessor, bond any mechanic's liens or judgments recorded against the premises or Lessor within two (2) weeks of such notice or in default thereof, Lessor may do so and add the cost and fees as rent.

7.    INSURANCE: Lessee covenants and agrees at its own expense to insure and keep insured the building or buildings thereon against loss or damage by fire and by extended coverage for not less than eighty percent (80%) of their replacement value in responsible insurance companies licensed in the state in which the premises are located, subject to the terms of paragraph 8 hereof, such insurance to be made payable in case of loss to Lessee.

    Lessee shall also maintain and keep in force for the mutual benefit of Lessor and Lessee general public liability insurance against claims for personal injury, death, or property damage occurring in, on or about the demised premises or sidewalks or premises adjacent to the demised premises to afford protection to the limit of not less than 1. million in respect to injury or death of a single person and to the limit of not less than 1 million in respect to any one accident and to the limit of $100,000 in respect to property damage. Lessee shall deliver to Lessor a certificate of said insurance and of renewals thereof from time to time during the term of this Lease, but no less frequently than every three (3) years.

8.    DAMAGE TO OR DESTRUCTION OF IMPROVEMENTS: If the building on the demised premises shall be rendered untenantable by fire or other casualty during the last five (5) years of the original term of this Lease or during any extension of the term, to the extent of 50% or more of the insurable value of the building, Lessee may, at Lessee's option, to be evidenced by notice in writing given to Lessor within thirty (30) days after the occurrence of such damage or destruction, elect to terminate this Lease as of the date of the damage or destruction, whereupon 5.C.  Lessee accepts the site "as is". Lessee agrees to fill and grade the premises and construct curbs and sidewalks at the south and east boundaries. In addition, Lessee will bring a manhole area near the north boundary up to grade and will maintain and keep it clean. ~~In consideration thereof Lessee shall not be obligated to pay rent for the twelfth month of the term of this Lease.~~

The parties recognize the Lessee would be unable to utilize the property herein unless it can design a septic system necessary to satisfy its requirements.  This Lease is therefore contingent upon the Lessee being able to design a septic system for which all necessary governmental approvals can be obtained which will satisfy the Lessee's requirements. In the Lessee's determination as to whether a system can so be designed to satisfy its requirements the Lessee may take into consideration the cost of construction.  The Lessee shall analyze the soil tests which it shall take pursuant to paragraph "19B" and in the event that within 45 days after receipt of said soil tests, the Lessee determines that a septic system cannot be so designed at a reasonable cost of construction or that the Lessee be unable to obtain all necessary approvals for said system, then the Lessee shall have a right to cancell this Lease Agreement by giving Lessor written notification as is provided for herein.

The access road to be  paved according to paragraph 5A is that roadway shown on the master plan immediately adjoining the demised premises to a distance of 225 feet being that driveway outlined in black upon said plan.  Said work is to be done by the Lessee who shall, upon completion of the work, bill the Lessor for one-half (½) the cost of the same, which the Lessor has hereby agreed to pay upon receipt and in the event that the Lessor shall fail to pay said amount, the Lessee may deduct the same from the rental which would become due and owing to the Lessor.

In the event Lessee exercises its right to terminate this lease as herein set forth, Lessor shall have the right for 45 days after Notice of Cancellation, at his cost, to assist Lessee and Lessee's engineers, if any, in the design and cost of an adequate septic system as herein defined.  Lessee shall cooperate with Lessor in this regard.

-2A-

Lessee shall pay to Lessor from the proceeds of its building insurance an amount equal to the lesser of the then present value of the remaining reserved rent as of the date of the casualty or all of the proceeds of the insurance and the right of recovery against insurers on policies covering such damage or destruction. Lessor shall also be entitled to payment for the reasonable cost of demolition in the event lessee elects to terminate the lease. In the event lessee elects to rebuild, rent, but not taxes shall abate for six (6) months or until the time the restaurant is operational, whichever shall first occur

9.    USE, ALTERATIONS AND TITLE TO IMPROVEMENTS: Notwithstanding any other provisions herein to the contrary, Lessee shall have the right to use and/or occupy the demised premises for any lawful purpose or purposes and to make, or permit any Sublessee to make, alterations, additions and improvements to the demised premises from time to time, and all of such alterations, additions and improvements constructed by Lessee during the term of this Lease and any extension thereof, shall be and remain the property of the Lessee or Sublessee, as the case may be, at all times during the term of this Lease and any extensions or renewals thereof. Lessee and any Sublessee shall have the right to remove any such alterations, additions and improvements at any time during the term of this Lease or any extension or renewal thereof, and for a period of thirty (30) days after the termination of this Lease, or any extension or renewal thereof, by lapse of time or otherwise and, for such purpose, to enter upon the premises. However, Lessee shall not be required to remove any such alterations, additions or improvements, and Lessee's failure to do so after the expiration of such period of thirty (30) days shall be deemed to be an abandonment thereof whereby the same shall, thereupon, be and become part of the real estate with title thereto vesting in the owner of the land. ~~In case of removal of any building by Lessee or any Sublessee occurring at or after the termination of this Lease, as aforesaid, Lessee shall level the area formerly occupied by any building so removed.~~ Lessee shall not, at the termination of this lease, remove the building, but shall be entitled to remove trade fixtures as aforesaid provided no material damage is done to the building.

10.    ASSIGNMENT AND SUBLETTING: Lessee may, without the consent of Lessor, sublease or assign this Lease or its rights hereunder. In such event Lessee shall remain liable for the payment of all rent required to be paid hereunder and for the performance of all terms, covenants and conditions herein undertaken by Lessee. Without limitation, it is agreed that Lessee shall have the right to mortgage or otherwise encumber its leasehold interest. Lessee shall not sublease or assign this lease to a competitor of the retail stores immediately to the north or south of the demised premises.

11.    MORTGAGING OF LEASEHOLD ESTATE: In the event that Lessee shall mortgage its leasehold estate and the mortgagee or holders of the indebtedness secured by the leasehold mortgage or trust deed notify Lessor, in the manner hereinafter provided for the giving of notice, of the execution of such mortgage or trust deed and name the place for service of notice upon such mortgagee or holder of indebtedness, then, in such event, Lessor hereby agrees for the benefit of such mortgagees or holders of indebtedness from time to time:

A. That Lessor will give to any such mortgagee or holder of indebtedness simultaneously with service on Lessee a duplicate of any and all notices or demands given by Lessor to Lessee from time to time. Such notices shall be given in the manner and be subject to the provisions of paragraph 23(E) of this Lease. Lessor shall not be liable for failure to provide such notices if lessee fails to inform lessor in writing of any change in identity, name or address of such mortgagee.

B. Such mortgagee or holder of indebtedness shall have the privilege of performing any of Lessee's covenants hereunder or of curing any default by Lessee hereunder or of exercising any election, option or privilege conferred upon Lessee by the terms of this Lease.

C. That Lessor shall not terminate this Lease or Lessee's right of possession for any default of Lessee if within a period of twenty (20) days after the expiration of the period of time within which Lessee might cure said default under the provisions of paragraph 12 of this Lease, such mortgagee or holder or indebtedness commences to eliminate the cause of such default and proceeds therewith diligently and with reasonable dispatch as in said paragraph 12 provided.

D. That, except for the rights to terminate contained in paragraphs 2 5, and 19 of this Lease, no right, privilege or option to cancel or terminate this Lease available to Lessee shall be deemed to have been exercised effectively unless joined in by any such mortgagee or holder of the indebtedness.

E. No liability for the payment of rental or the performance of any of Lessee's covenants and agreements hereunder shall attach to or be imposed upon any mortgagee, trustee under any trust deed or holder of any indebtedness secured by any mortgage or trust deed upon the leasehold estate, all such liability being hereby expressly waived by Lessor.

12.    LESSOR'S RIGHT OF RE-ENTRY: If Lessee shall fail to pay any installments of rent promptly on the day when the same shall become due and payable hereunder, and shall continue in default for a period of thirty (30) days after written notice thereof by Lessor, or if Lessee shall fail to promptly keep and perform any other affirmative covenants of this Lease strictly in accordance with the terms of this Lease and shall continue in default for a period of thirty (30) days after written notice thereof by Lessor of default and demand of performance, then and in any event, and as often as any such event shall occur, Lessor may (a) Declare the said term ended, and enter into

-3-

said demised premises, or any part thereof, either with or without process of law, and expel Lessee or any person occupying the same in or upon said premises, using such force as may be necessary to do so, and so to repossess and enjoy said premises as in Lessor's former estate; and/or (b) Re-let the premises, applying said rent from the new tenant on this Lease, and Lessee shall be responsible for no more than the balance that may be due, should a balance exist. Anything hereinbefore contained to the contrary notwithstanding, if any default shall occur other than in the payment of money, which cannot with due diligence be cured within a period of thirty (30) days, and Lessee, prior to the expiration of thirty (30) days from and after the giving of notice as aforesaid, commences to eliminate the cause of such default, then the Lessor shall not have the right to declare the said term ended by reason of such default.

13.    *HOLDING OVER:* In the event Lessee continues to occupy the premises after the last day of the term hereby created, or after the last day of any extension of said term, and the Lessor elects to accept rent thereafter, a tenancy from month to month only shall be created and not for any longer period.

14.    *CONDEMNATION:* If the whole or any part of the demised premises shall be taken or condemned by any competent authority for any public use or purpose during the term of this Lease, Lessee reserves unto itself the right to claim and prosecute its claim in all appropriate courts and agencies for an award or damages based upon its leasehold interest and ownership of buildings, alterations and improvements for such taking without impairing any rights of Lessor for the taking of or injury to the reversion.

In the event that a part of the demised premises shall be taken or condemned which, in the sole judgment of Lessee, is sufficient to render the remaining portion thereof unsuitable for its continued use or occupancy, then and in any such event, Lessee may at any time, either prior to or within a period of sixty (60) days after the date when possession of the premises shall be required by the condemning authority, elect to terminate this Lease, or, if an option to purchase the premises is conferred upon Lessee by any other provision of this Lease, may as an alternative to such termination of this Lease elect to purchase the demised premises in accordance with such purchase option, except that there shall be deducted from the purchase price to be paid for the premises all of Lessor's award from the condemnation proceeding. In the event that Lessee shall fail to exercise any such option to terminate this Lease or to purchase the premises, then and in either such event this Lease shall continue in effect with respect to the portion of the demised premises not so taken except that the annual rent payable herein shall be reduced by a fraction, the numerator of which shall be the number of square feet taken or condemned and the denominator of which shall be the square footage of the demised premises prior to the taking or condemnation. Lessee will, with all due diligence and at its own cost and expense, repair and restore the demised premises or what may remain thereof to their former condition, and until the completion of such work, the obligation of Lessee to pay rent and real estate taxes shall abate.

Provided Lessee is not in default of the provisions hereof
15.    *OPTION TO EXTEND:* Lessor does hereby grant to Lessee the right, privilege, and option to extend this Lease for a period of ____TEN_____
_____ ( 10 ) years from the date of expiration hereof, upon the same terms and conditions as herein contained, upon notice in writing to Lessor of Lessee's intention to exercise said option, given at least ninety (90) days prior to the expiration of the term hereof. Provided Lessee is not then in default thereof, and

In the event that Lessee shall have exercised said option to extend the term of this Lease, Lessor does hereby grant to Lessee the right, privilege and option again to extend this Lease for ( 1 ) successive periods of _____TEN_____ ( 10 ) years each, upon the same terms and conditions as herein contained, upon notice in writing to Lessor of Lessee's intention to exercise each said option, given at least ninety (90) days prior to the expiration of the preceding extension of the term hereof. The rent at the inception of the first extension period shall be seven and one half (7 1/2%) per cent greater than the rent for the immediately preceding month. The rent shall increase by seven and one half ( 7 1/2%) per cent every five (5) years during both option periods.

16.    *LESSEE'S RIGHT OF FIRST REFUSAL TO LEASE:* If at any time during the term of this Lease, Lessor shall desire to accept a bona fide offer received by it to lease the premises for a term commencing at or after the expiration of the term of this Lease, Lessor shall notify Lessee of such offer in the manner provided in this Lease for the giving of notice, (said notice shall include executed copies of all relevant documents and the name and address of the offeror) and Lessee shall have the right to relet the premies upon the terms and conditions of such offer by giving Lessor written notice of its election to do so within fifteen (15) days after receipt of Lessor's notice. In the event Lessee fails to notify Lessor of its election within the fifteen (15) day period, Lessor shall have the right to lease the premises to any person upon the terms and conditions contained in said notice to Lessee.

17.   *OPTION TO PURCHASE AND RIGHT OF FIRST REFUSAL TO PURCHASE:* Lessee shall have, and is hereby given, the option of purchasing said demised premises for the sum of One hundred sixty-five thousand DOLLARS ($165,000 ) provided Lessee shall give Lessor notice in writing of its election to exercise said option to purchase any time during the original term or any extension or renewal thereof.

It is further agreed that should Lessor, or Lessor's heirs, executors, successors or assigns, at any time during the term of this Lease or any extension thereof, receive an offer to purchase the demised premises or any part thereof, and Lessor desires to accept said offer; or should Lessor during any such time make an offer to sell the demised premises or any part thereof, Lessor shall give Lessee thirty (30) days notice in writing of such offer setting forth the name and address of the proposed purchaser with executed copies of all relevant documents, the amount of the proposed purchase price, and all other terms and conditions of such offer; and Lessee shall have the first option to purchase the premises which are the subject of the offer by giving written notice to Lessor of its intention to purchase within said thirty (30) day period, at the same price and on the same terms of any such offer, it being understood that in the event Lessee does not give notice of its intention to exercise said option to purchase within said period, this Lease and all of its terms and conditions shall, nevertheless remain in full force and effect and Lessor and any Purchaser or Purchasers of the demised premises, shall be bound thereby. In the event that the premises set forth in the offer are or are not sold, Lessee shall have, upon the same conditions and notice, the continuing first option to purchase the demised premises or any part thereof, upon the terms of any subsequent offer or offers to purchase. This provision shall not apply if such bona fide offer would not be contingent upon purchaser's ability to obtain approval for the subdivision of the demised premises.

In the event any of the foregoing options are exercised, Lessor shall convey a merchantable title in fee simple to said real estate by ~~good and sufficient stamped warranty deed, with release of~~ dower, homestead, curtesy and other rights of the respective spouses, if any, and free from all encumbrances whatsoever. ~~In addition, in the exercise of such options, all monies shall be placed with an escrowee of Lessee's designation and the settlement of the purchase price and the conveyance to Lessee shall take place in escrow. Within thirty (30) days of the date of exercise of any such option, Lessor will furnish to Lessee a guarantee title policy issued by a title insurance company acceptable to Lessee, in its usual form, brought down to said date of exercise, guaranteeing Lessee against loss or damage to the extent of the purchase price by reason of defects in or liens upon Lessor's title, subject only to the usual exceptions contained in guarantee title policies of the issuing company. Settlement of the purchase price and conveyance to the Lessee shall be made within ninety (90) days from said date of exercise.~~ Taxes, utilities, rents, and other current expenses, shall be adjusted as of the date Lessee exercises its option, acquires title. Lessee shall obtain all title insurance, at its own expense, that it deems necessary.

In the event there are any conflicts between the terms in this lease concerning the exercise of the aforementioned option involving the right of first refusal and the terms contained in the offer which Lessee must accept if Lessee desires to purchase said demised premises, then the terms of this Lease shall control and supersede those contained in such offer.

18.   COVENANT OF TITLE AND QUIET ENJOYMENT: Lessor covenants that Lessor is well seized of and has good title to the leased premises free and clear of all liens, encumbrances and restrictions. Lessor warrants and will defend the title thereto, and will indemnify Lessee against any damage and expense which Lessee may suffer by reason of any lien, encumbrance, restriction or defect in the title or description herein of the premises. If, at any time, Lessor's title or right to receive rent hereunder is disputed, or there is a change of ownership of Lessor's estate by act of the parties or operation of law, Lessee may withhold rent thereafter accruing until Lessee is furnished proof satisfactory to it as to the party entitled thereto.

19.   ADDITIONAL CONTINGENCIES:

A.   EVIDENCE OF TITLE: Within thirty (30) days from the date of last execution of this Lease, Lessee shall apply for leasehold title insurance, from a title company acceptable to Lessee, in the amount of not less than ONE HUNDRED AND FIFTY THOUSAND and No/100 ($150,000.00) DOLLARS, or that required by law or the title insurer, covering the date hereof, showing title in Lessor. If the report on title, title binder, or commitment, so required, discloses any defects in title (other than such usual objections contained in Leasehold policies and matters to which this Lease is subject) Lessor shall have sixty (60) days from the date which such title report, binder, or commitment bears to cure such defects and to furnish such title report, binder, or commitment showing such defects cured or removed. If such defects in title are not so cured within sixty (60) days, Lessee may, at its option, terminate this Lease. In the event this Lease is so terminated all monies, deposits and instruments shall be returned to the respective parties. Immediately, upon final execution of this Lease, Lessor shall deliver to Lessee's title company, if so required, all prior title evidence such as title policies, abstracts, or attorney's opinions. A certain easement granted by Manley Behrens to the Hyde Park Fire and Water District, shall not constitute a defect in title, and Lessee accepts the premises subject thereto, unless with sixty (60) days from the date of last execution of this Lease, Lessee shall declare the lease null and void based upon its inability to utilize the premises due to such easement. The parties further agree that if patching of the drive-way or parking area is necessary after repair to the water pipes by the District, the parties will equally bear such cost. A copy of said easement is annexed.

-5-

B.    *BORING AND PERCOLATION CONTINGENCIES:* This Lease is further contingent upon Lessee obtaining within sixty (60) days from the date hereof such boring and percolation tests as may be required to determine the physical characteristics, including the water table of sub-strata, of the premises in question. In the event such reports indicate, in Lessee's sole judgment, that the premises are unsatisfactory for Lessee's intended use, Lessee may, at its option, declare this Lease to be null and void and of no further force and effect. In the event Lessee exercises its right to terminate this Lease under this paragraph, Lessee shall not be liable to Lessor for any claims in law or equity arising from said termination.

C.    *TOPOGRAPHICAL SURVEY:* Lessee may order a current certified topographical survey by a licensed surveyor within thirty (30) days from the last execution of this Lease. Said topographical survey shall show:

    (a)   The area, dimensions and location of the property;
    (b)   Its topography;
    (c)   The location of existing improvements and available utilities in adjoining streets, alleys or property;
    (d)   The location of all recorded easements against or appurtenant to the property;
    (e)   Encroachments of any improvements adjoining the premises on the demised premises; and
    (f)   The legal description of the premises.

If said survey discloses unsuitable or interferring easements or encroachments or that the location, area, dimensions and shape of the demised premises are not as represented by Lessor, then Lessee shall have the right to terminate this Lease and declare same null and void and of no force and effect.

~~Lessee shall be entitled to reimbursement from Lessor, either as a credit against rent or by cash payment, for all title examination costs and premiums, survey fees and boring and percolation tests costs.~~ Lessor has provided a perimeter survey and metes and bounds description, annexed.  Lessor shall not be liable for any other costs involved in establishing Lessee's site plan.

20.    *TRADE FIXTURES, MACHINERY AND EQUIPMENT:* Lessor agrees that all trade fixtures machinery, equipment, furniture or other personal property of whatever kind and nature kept or installed on the leased premises by Lessee's subtenants shall not become the property of Lessor or a part of the realty no matter how affixed to the leased premises and may be removed by Lessee's subtenants, in their discretion, at any time and from time to time during entire term of this Lease and any renewals. Upon request of Lessee or Lessee's assignees or any subtenant, Lessor shall execute and deliver any Real Estate Consent or Waiver forms submitted by any Vendors, Lessors, Chattel Mortgagees or holders or owners of any trade fixtures, machinery, equipment, furniture or other personal property of any kind and description kept or installed on the demised premises by any subtenant setting forth the fact that Lessor waives, in favor of such Vendor, Lessor, Chattel Mortgagee or any holder or owner, any lien, claim, interest or other right therein superior to that of such Vendor, Lessor, Chattel Mortgagee, owner or holder. Lessor shall further acknowledge that property covered by such Consent to Waiver forms is personal property and is not to become a part of the realty no matter how affixed thereto and that such property may be removed from the leased premises by the Vendor, Lessor, Chattel Mortgagee, owner or holder at any time upon default by the subtenant in the terms of such Chattel Mortgage or other similar documents, free and clear of any claim or lien of Lessor.    Removal of fixtures shall be limited to items not built into walls, floors or ceiling. Lessee may remove decorative partitions. Lessee shall repair material damage.

21.    *MORTGAGE CONTINGENCY AND SUBORDINATION:* Lessor further agrees that it will, upon written demand by Lessee, execute such instruments as may be required at any time and from time to time to subordinate the rights and interest of Lessor in the fee to the lien of a first mortgage, mortgages, trust deed, or trust deeds now or hereafter at any time placed by Lessee on the premises herein demised, such mortgage or mortgages not to exceed the total sum of TWO HUNDRED THOUSAND ―――――――――――――――――DOLLARS ($ 200,000.00 ) and such mortgage or mortgages to be payable in full within the term, ~~or any extension thereof,~~ of this Lease. If required by the lending institution, Lessor further agrees to join in the execution of such documents as may be necessary but shall not thereby incur any personal liability. The proceeds of any indebtedness secured hereunder shall be applied to new construction, only. All loans shall be placed with a bank, life insurance company or other institutional lender.

22.    *RECORDING:* Lessee and Lessor agree to execute and record a short form or memorandum of this Lease as soon as Lessee has obtained an approved survey and legal description of the demised premises. The cost of all documentary stamps, or conveyancing, transfer tax and recording fees shall be paid ~~equally by the parties hereto.~~ by Lessee.

23. *MISCELLANEOUS PROVISIONS:*

A. If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons whose circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby.

B. The terms, conditions and covenants of this Lease shall be binding upon and shall inure to the benefit of each of the parties hereto, their heirs, personal representatives, successors, or assigns, and shall run with the land; and where more than one party shall be Lessors under this Lease, the word Lessor whenever used in this Lease shall be deemed to include all parties hereto jointly and severally.

C. No waivers, alterations or modifications of this Lease or any agreements in connection therewith shall be valid unless in writing duly executed by both Lessor and Lessee herein.

D. The captions appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such Paragraphs of this Lease or in any way effect this Lease. Any gender used herein shall be deemed to refer to any other gender more grammatically applicable to the party to whom such use of gender relates. The use of singular herein shall be deemed to include the plural and, conversely, the plural shall be deemed to include the singular.

E. If at any time after the execution of this Lease, it shall become necessary or convenient for one of the parties hereto to serve any notice, demand or communication upon the other party, such notice, demand or communication shall be in writing signed by the party serving the same, deposited in the registered or certified United States mail, returned receipt requested, postage prepaid and (a) If intended for Lessor shall be addressed to:

> Mr. Harold Miller
> 85 Market Street
> Poughkeepsie, New York     12601

and (b) If intended for Lessee shall be addressed to:

> McDonald's Plaza
> Oak Brook, Illinois 60521

or to such other address as either party may have furnished to the other in writing as a place for the service of notice. Any notice so mailed shall be deemed to have been given as of the time the same is deposited in the United States mail.

F. In the event that at any time during the term of this Lease either the Lessor or the Lessee shall institute any action or proceeding against the other relating to the provisions of this Lease, or any default hereunder, then, and in that event, the unsuccessful party in such action or proceeding agrees to reimburse the successful party for the reasonable expenses of attorneys' fees and disbursements incurred therein by the successful party.

~~24.   RULE AGAINST PERPETUITIES: If this Lease has not been previously terminated pursuant to the terms and provisions contained herein, and the term of this Lease and/or the commencement date for rent hereunder shall not have been ascertained within five (5) years from the date appearing on Page 1 of this Lease, then and in that event this Lease shall thereupon become null and void and have no further force and effect whatsoever in law or equity.~~

25. *CONFLICT OF INTERESTS:* The Lessor and (if Lessor is not an individual) the party(ies) executing this Lease for or on behalf of the Lessor, or as a representative of the Lessor, hereby represent that, to the best of his/her/their knowledge, he/she/they, or any person connected directly or indirectly, with the Lessor is/are not (an) agent(s), employee(s), servant(s), supplier(s), licensee(s) or officer(s) of the Lessee or any subsidiary, affiliate or parent corporation thereof, or related to any agent, employee, servant, supplier, licensee or officer of the Lessee or any subsidiary, affiliate or parent corporation thereof. The Parties executing this Lease acknowledge that the foregoing representations are and shall be relied upon by the Lessee as inducement to enter into this Lease.

26. *RIDERS AND EXHIBITS:* This Lease includes the following Rider(s) and/or Exhibits, which shall take precedence over conflicting provisions (if any) of this Lease, and are hereby made an integral part of this Lease and fully incorporated herein by reference:

> Property description, Master Plan and Easement

Lessee agrees to make diligent application for site plan approval immediately on execution of this lease. Lessee agrees to comply with all reasonable anning Board requisites in connection therewith.

-7-

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals.

LESSOR:

_____ (seal)

_____ (seal)

_____ (seal)

LESSEE:

BY: _____
Vice President

ATTEST:

_____
Assistant Secretary

DATE OF
EXECUTION:  June    8  , 1976

DATE OF
EXECUTION:  June          , 1976

WITNESS:

_____

_____

WITNESS:

_____

_____

(APPEND ACKNOWLEDGEMENTS)

-8-

STATE OF  Illinois        :  COUNTY OF    Cook        :ss

On the  30th   day of ~~June~~, 1976, before me personally

came  Luigi Salvaneschi and Robert B. Ryan                    ,to me known,
who by me duly sworn, did depose and say that they resides at

No. 23 W 081 Black Cherry Land, Glen Ellyn, Ill., and 1531 Basswood Cir., Glenview,
           are     Vice President and Asst. Vice-          Ill., respectively
that ~~they is~~ the/President, respectively  of FRANCHISE REALTY INTER-
STATE CORPORATION, the corporation mentioned in, and which executed,
the foregoing instrument; that he knows the seal of said corpora-
tion; that the seal affixed to said instrument is such corporate
seal; that it was so affixed by order of the Board of Directors of
said corporation; and that he signed his name thereto by like
order.

My Commission Expires Jan. 11, 1979                    Notary Public

STATE OF NEW YORK:    COUNTY OF DUTCHESS;    ss:

On the    8th day of June, 1976, before me personally

came HAROLD MILLER, to me known and known to me to be the individ-
ual described in, and who executed, the foregoing instrument,
and he acknowledged to me that he executed the same.

Notary DIANA C. ROBERTSON
Notary Public in the State of New York
Residing in Dutchess County
Commission Expires March 30, 19 78

IN CONSIDERATION of the letting of the premises within

mentioned to the within named Lessee and the sum of $1.00 paid to

the undersigned by the within named Lessor, the undersigned

does hereby covenant and agree, to and with the Lessor and the

Lessor's legal representative, that if default shall at any time

be made by the said Lessee in the payment of the rent and the

performance of the covenants contained in the within lease, on

the Lessee's part to be paid and performed, that the undersigned

will well and truly pay the said rent, or any arrears thereof,

that may remain due unto the said Lessor, and also pay all

damages that may arise in consequence of the non-performance of

said covenants, or either of them without requiring notice of

any such default from the said Lessor.  The undersigned hereby

waives all right to trial by jury in any action or proceeding here-inafter instituted by the Lessor, to which the undersigned may be a party.

IN WITNESS WHEREOF, the undersigned has set its hand and seal this 30th day of ~~June~~ July, 1976.

McDONALD'S CORPORATION

By: _____

STATE OF    Illinois    :COUNTY OF    Cook    :ss

On the 30th day of ~~June~~ July, 1976, before me personally came    Luigi Salvaneschi    ,to me known, who by me duly sworn, did depose and say that he resides at

No. 23 W 081 Black Cherry Lane, Glen Ellyn, Ill.

that he is the    Vice-President    of McDONALD'S CORPORATION, the corporation mentioned in, and which executed, the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he signed his name thereto by like order.

My Commission Expires Jan. 11, 1977    _____
                                        Notary Public

RIDER to Lease dated June 8, 1976 by and between HAROLD MILLER, as Lessor, and FRANCHISE REALTY INTERSTATE CORPORATION, as Lessee.

1.  In addition to the demised premises set forth on page 1A, the Lessor does hereby grant to the Lessee the following rights for that property set forth in the Supplement of Lease attached hereto and made a part hereof:

1) The Lessee shall have the right of ingress and egress to said property together with the right to develop said property for the purposes of using said lands for parking in conjunction with its proposed development pursuant to the terms and provisions of this lease. The Lessee shall have the right to pave said area, to curb said area, to stripe the area for designation as parking and to perform any other work in said area necessary to prepare said land for a parking field, including any provisions necessary for appropriate drainage of said land and for proposed lighting of said land.

2)  The Lessor shall, prior to the commencement of the term of this lease, and prior to the obligation of the Lessee to pay to the Lessor rentals pursuant to the terms of this lease, grade said property to an elevation set forth upon the plot plan which is attached hereto and made a part hereof. The Lessee, in making its application for the required permits pursuant to the terms and provisions of this Lease, shall have a right to include in its plans its proposed development of said parking field and a failure of any contingency in the lease including but not limited to the provisions dealing with obtaining the necessary building permits, boring and percolation tests, and the title requirements* shall allow the Lessee to cancel the entire Lease.

3) The Lessee shall be obligated to pay to the Lessor any increases in the real estate taxes for said property. The Lessee's real estate taxes therefore shall be the payment of the real estate taxes on the property described on page 1A as is set forth in paragraph 5E and for the increased real estate taxes over the base year, which year shall be the first year of the term of this Lease on the property set forth in the schedule attached hereto. The Lessee shall pave a roadway or means of ingress and egress to said property as is set forth on the attached plot plan and is outlined in red upon the commencement of the term of this Lease. The Lessee shall have an exclusive

* affecting the property by which the Lessee has parking rights upon



RIDER to Lease dated June 8, 1976 by and between HAROLD MILLER, as Lessor, and FRANCHISE REALTY INTERSTATE CORPORATION, as Lessee.

Page 2

right to park on that property set forth in the Supplement of Lease except as is hereinafter provided. The Lessee shall maintain the area in good condition and repair and shall carry all insurance required under the terms and provisions of the main lease and all obligations and duties of the Lessee under the terms and provisions of the lease shall be applied to said property. In the event that the Lessor develops the adjoining lands set forth in Exhibit A attached hereto and made a part hereof with improvements, ~~containing a minimum of _____ square feet,~~ the Lessor shall have the right to notify the Lessee that it shall incorporate the lands set forth in *Exhibit A* into said development. In the event that the Lessor so notifies the Lessee of its intention to utilize the land set forth in the Supplement of Lease, then the provisions and terms of this paragraph concerning said lands in the Supplement of Lease shall terminate as of that date and the terms and provisions of the Supplement of Lease shall prevail. The Lessee's rights to said lands shall be set forth in the Supplement of Lease and the Lessor shall assume all obligations as is set forth in said Supplement of Lease. The Lessee and Lessor shall have common and mutual rights to said lands as set forth in the Supplement of Lease and the Lessee's obligations concerning said property shall only be those as are specifically stated in the Supplement of Lease and thereafter the Lessee shall have no further obligations for the same of the increased real estate taxes against the said property, for the maintenance of said property, or or the maintenance of insurance upon said property, or for lighting charges. ~~(HM)~~

# EXHIBIT B

SUPPLEMENT

LEGAL DESCRIPTION AND PARKING EASEMENT

This Supplement is attached to and forms a part of that certain Lease dated

_____June 8_____, 19 76 , by and between  HAROLD MILLER  _____

_____as Lessor, and   FRANCHISE REALTY INTERSTATE  _____

__CORPORATION_____as Lessee.

1.  DESCRIPTION OF PROPERTY

A.  Lessor hereby leases to Lessee a portion of the following described real

property in the City of __Hyde Park_____, County of _____

Dutchess_____, State of   New York_____ :

~~(Insert legal description~~
~~of entire shopping center).~~

*SEE EXHIBIT "A" - ATTACHED*

* *Together with the rights to use in common with the Lessor as is*
*provided for, here and after any parking fields erected by the*
*Lessor on his adjoining lands.*

B.  A portion of the above description includes the site for a McDonald's

Restaurant to be erected by _____Lessee_____ having a width of 135'±

_____ and running a depth of  210'±  _____

located as shown on plot plan ~~dated_____~~attached

hereto and made part hereof as Exhibit "A" (the exact legal description

based upon the certified survey provided in accordance with Article __1__

shall be incorporated herein by Amendment), together with all of Lessor's

easements and appurtenances in adjoining land, highways, roads, streets,

lanes, whether public or private, reasonably required for the installation

maintenance, operation on service of sewer, water, gas, power, and other

utility lines.

2.  PARKING EASEMENTS AND USE OF COMMON AREAS

A.  All of those portions of *Exhibit "A"* designated as common areas,

parking areas, and driveways for ingress and egress on Exhibit "A" may be

used, during the entire term of this lease and any extension thereof, by the

McD OR-12-73

Lessee, its invitees, licensees, and patrons, in common with all other tenants of the Shopping Center. Lessor agrees that said parking area ~~shall consist of not less than _____ car parking spaces, as shown on Exhibit "A", and that said parking area~~, common areas and drives, as shown on Exhibit "A", shall not be changed without Lessee's consent.

B. ~~Lessee and~~ Lessor may erect curbs or curbstops in order to define the ~~demised premises and~~ adjoining commercial areas, so long as said curbstops do not detract from the mutual and common parking and access rights of the Lessee.

3. MAINTENANCE OF PARKING & COMMON AREAS

A. During the entire term of this lease and any extensions thereof, Lessor shall maintain and repair the entire parking and common areas shown on Exhibit "A". This obligation on the part of Lessor to maintain said parking and common areas in good condition and repair shall, without limiting the generality thereof, include the following.

   a) Maintaining the surfaces in a level, smooth and evenly-covered condition with the type of surfacing material originally installed or of similar quality, use and durability;

   b) Removing all papers, debris, snow, ice, filth and refuse and thoroughly sweeping the areas to the extent reasonably necessary to keep said areas in a neat, clean and orderly condition;

   c) Placing, keeping in repair, and replacing any necessary appropriate direction signs, markers and lines; and operating, keeping in repair, and replacing when necessary such artificial lighting facilities as shall be reasonably required;

   d) Maintaining any perimeter walls in a good condition and state of repair;

   e) Maintaining all landscaped areas, making such replacements of shrubs and other landscaping as is necessary, and keeping said areas at all times adequately weeded, fertilized and watered.

B. During the term of this lease, Lessor shall have the right to enact reasonable rules for all tenants concerning the conduct and operation of the parking and common areas.

C.  It is specifically understood and agreed that Lessee shall have no
    obligation or liability whatsoever in connection with the ownership,
    maintenance or management of the parking area, malls and common areas
    involved, and that Lessor shall manage, operate and maintain the parking
    area, malls, and common areas, or cause the same to be done on its
    behalf, and that Lessor, and/or its nominee, shall provide and maintain,
    at its cost and expense, during the entire term of said Lease as it may
    be extended, insurance policy or policies which will insure Lessee
    against injury to persons occurring in, on or about said parking area,
    malls, and common areas, the liability under such insurance to be not less
    than *ONE MILLION ($1,000,000) DOLLARS* ~~Five Hundred Thousand Dollars ($500,000.00)~~ for any one person injured
    or One Million Dollars ($1,000,000.00) for any one accident or One Hundred
    Thousand Dollars ($100,000.00) for property damage.  Lessor shall cause to
    be issued to Lessee proper certificates of insurance evidencing that the
    foregoing covenants of Lessor have been complied with, and such certificates
    shall provide that if the underlying insurance is cancelled or changed
    during the policy period the insurance carrier will notify the Lessee twenty
    (20) days prior to same.

D.  In the event that Lessee acquires title to the demised premises pursuant to
    the terms of this lease, the easements herein conveyed shall be perpetual.
    In such event, Lessor agrees to deliver to Lessee, at closing, a recordable
    document to effectuate the foregoing.

LESSOR:    HAROLD MILLER

BY:

ATTEST:

WITNESS:

LESSEE:  FRANCHISE REALTY INTERSTATE
                                    CORPORATION

BY:

ATTEST:

WITNESS:
         Asst. Secretary

# EXHIBIT C

AGREEMENT dated this 23RD day of MAY, 1977 by and between HAROLD MILLER (hereinafter referred to as Lessor), and FRANCHISE REALTY INTERSTATE CORPORATION, (hereinafter referred to as Lessee).

WHEREAS, the parties lease a certain parcel of land in the Town of Hyde Park, County of Dutchess, State of New York by Lease dated June, 1976; and

WHEREAS, the parties had submitted for approval certain plans and specifications for the proposed development by the Lessee; and

WHEREAS, a permit has been issued pursuant to said plans, but said permit is conditioned upon certain conditions which are not the subject of the Lease dated June, 1976.

NOW THEREFORE, for One ($1.00) Dollar and other valuable consideration receipt of which is hereby acknowledged, the parties agree as follows:

1) : The demised premises set forth in the Lease is hereby amended, and substituted in lieu thereof is the following description:

PARCEL 1

BEGINNING at a point in the easterly line of Route 9 the said point being the northwesterly corner of the herein described parcel and being South 01 degrees 03 minutes and 50 seconds East 83.64 feet from the northwesterly corner of lands of Harold Miller and the southwesterly corner of lands of Joseph H. Mesuda thence through the lands of Harold Miller along the northerly line of the herein described parcel South 88 degrees 08 minutes 50 seconds East 220.20 feet to the northeasterly corner of the herein described parcel being a point in the westerly line of a future interior access road running in a north-south direction within the proposed shopping center; thence still through the lands of Harold Miller along the easterly line of the herein described parcel along the westerly line of the above mentioned future interior access road South 01 degrees 03 minutes 50 seconds East 129.75 feet to the southeasterly corner of the herein described parcel being the point of intersection of the westerly line of the above mentioned future interior access road with the northerly line of a future entrance road from Route 9; thence still through the lands of Harold Miller along the southerly line of the herein described parcel along the northerly line of the future entrance road from Route 9 following in part a portion of existing curb North 89 degrees 30 minutes 40 seconds West 204.94 feet and along a curve to the right on a radius of 30.00 feet a distance of 30.38 feet to the southwesterly corner of the herein described parcel being the point of intersection of the northerly line of the above mentioned road with the easterly line of Route 9; thence along the westerly line of the herein described parcel along the easterly line of Route 9 North 01 degrees 03 minutes 50 seconds West 120.89 feet to the point or place of beginning and containing 0.67 acres more or less.

Subject to a water line easement ten feet in width granted to the Hyde Park Fire and Water District, said easement being recorded in Liber 1034 of Deeds at Page 35.

PARCEL 2

BEGINNING at the southwesterly corner of the herein described parcel the said point being South 89 degrees 30 minutes 40 seconds East 30.01 feet from

AGREEMENT dated this        day of        , 1977 by and between
HAROLD MILLER (hereinafter referred to as Lessor), and FRANCHISE
REALTY INTERSTATE CORPORATION, (hereinafter referred to as
Lessee).

## Page 2

the southeasterly corner of the above described 0.67 acre
parcel #1; thence through lands of Harold Miller along the
westerly line of the herein described parcel along the easterly
line of a future interior access road North 01 degrees 03
minutes 50 seconds West 136.51 feet and along a curve to the left
on a radius of 203.00 feet a distance of 3.50 feet to the north-
westerly corner of the herein described parcel; thence continuing
through lands of Harold Miller along the northerly line of the
herein described parcel South 87 degrees 07 minutes 10 seconds
East 120.00 feet to the northeasterly corner of the herein des-
cribed parcel; thence continuing through lands of Harold Miller
along the easterly line of the herein described parcel South 01
degrees 10 minutes 40 seconds East 135.00 feet to the south-
easterly corner of the herein described parcel; thence continuing
through lands of Harold Miller along the southerly line of the
herein described parcel North 89 degrees 30 minutes 40 seconds
West 120.00 feet to the point or place of beginning and
containing 0.38 acres more or less.

Subject to a water line easement ten feet in width granted
to the Hyde Park Fire and Water District as it crosses the
southwesterly corner of the above described parcel, said
easement being recorded in Liber 1034 of Deeds at Page 35.

(The above descriptions are subject to verification by
Milton Chazen, L.S.)

2)  Whereas the revised legal description set forth in paragraph

"1" herein extends the demised premises an additional depth of

ten feet, Exhibit A of the Lease is modified in that the demised

premises shall be extended an additional ten feet in depth and

the road to the rear of said demised premises for the additional

parking shall also be moved eastward by said ten feet.

3)  Lessee has placed out to bid the paving of the access road

to the south of the demised premises running from Route 9

eastward to the additional parking area. The cost for doing said

work is $3,150.

The Lessor agrees to pay to the Lessee an amount equal to $1,575,

upon the completion of said work by the Lessee.

AGREEMENT dated this        day of        , 1977 by and between
HAROLD MILLER (hereinafter referred to as Lessor), and FRANCHISE
REALTY INTERSTATE CORPORATION, (hereinafter referred to as
Lessee).

### Page 3

4)   Lessor shall immediately commence to complete the work
required for it to complete pursuant to the Lease Agreement and
terms of the Building Permit.  Said work shall include grading
of that property set forth in Exhibit A which is identified as
additional parking.  The Lessor further agrees to immediately
commence the overall improvement of the site and other off site
lands, including his shopping center and to continue said work
diligently and continually, barring acts of god, strikes and
other such calamities beyond his control.

5)   Lessor does also agree to complete all work on the Lessor's
adjoining property which must be completed in order to obtain a
certificate of occupancy for the Lessee's proposed use to be
issued by the appropriate governmental authority to be completed
prior to the date agreed upon as a reasonable time for the
promotion of the opening of the McDonald's restaurant.

6)   As Consideration for the Lessor's promise to complete said
work provided for herein in Paragraphs 3, 4, and 5, the Lessee
agrees to commence the payment of rent on February 11, 1977, any
rent from said date to the date hereof to be paid upon execution
of this agreement.

     In addition, as consideration for the Lessor's agreement to
add the hereinabove described land to the demised premises,
Lessee agrees to pay the sum of Nine Thousand Two Hundred Forty
($9,240) Dollars, as additional rent, due and payable upon
execution of this instrument.

7)   The parties agree that Lessor's obligation to pave the roads
shall, notwithstanding the date, be subsequent and subject to
Lessee's construction activities which may damage said pavement.

8)   In the event Lessor fails to complete his work as aforesaid,
Lessee, upon prior written notice of intention to Lessor, may

AGREEMENT dated this        day of            , 1977 by and between
HAROLD MILLER (hereinafter referred to as Lessor), and FRANCHISE
REALTY INTERSTATE CORPORATION, (hereinafter referred to as
Lessee).

### Page 4

complete the work at a reasonable cost, and deduct the expense

thereof from the rents to be paid by Lessee.

9)  The lease, as herein modified, is ratified and confirmed.

IN WITNESS WHEREOF the parties set their hands and seals.

Lessor                          Lessee

                                FRANCHISE REALTY INTERSTATE CORPORATION

_____         By _____
HAROLD MILLER

# EXHIBIT D

This Agreement, made this 30th day of May, 1980, between HAROLD MILLER, 85 Market Street, Poughkeepsie, New York, the "Lessor"

and

McDONALD'S CORPORATION, successor to Franchise Realty Interstate Corporation ~~FRANCHISE REALTY INTERSTATE CORPORATION~~, McDonald's Plaza, Oak Brook, Illinois, the "Lessee"

WITNESSETH

WHEREAS, Lessor and Lessee are landlord and tenant of certain real property at Route 9, Town of Hyde Park, Dutchess County, New York, under a Lease Agreement dated June 8, 1976, as amended by instrument dated May 23, 1977, and

WHEREAS, Lessee wishes to install a drive-through window and make other improvements which shall of necessity result in increased costs to Lessor for maintaining his adjacent realty.

NOW THEREFORE, in consideration of the premises the parties agree as follows:

1. Lessor shall cooperate with Lessee in obtaining all approvals necessary for the drive-through window and attendant improvements. All costs shall be borne by Lessee.

2. Lessee shall pay, commencing June 1, 1980, the sum of ONE HUNDRED TWENTY FIVE ($125) DOLLARS per month as additional rent.

3. Said sum shall be due monthly throughout any renewal periods and notwithstanding any other increments in rent pursuant to the terms of the Lease.

4. Lessor shall be held harmless from any claims arising from the construction as aforesaid.

In Witness Whereof, the parties have set their hands and seals the day and year first above written.

Lessor                          Lessee: McDONALD'S CORPORATION

HAROLD MILLER                   BY: _____
                                         Vice President

                                ATTEST: _____
                                        Assistant Secretary

# EXHIBIT E

## DECLARATION OF COVENANTS AND RESTRICTIONS

THIS DECLARATION, made this 27th day of January, 1981, by HAROLD MILLER, 85 Market Street, Poughkeepsie, New York, and CORNWALL-PARK PARTNERSHIP, a New York Limited Partnership with principal offices at 690 Whitehead Road, Trenton, New Jersey hereinafter collectively referred to as the "Declarant".

## W I T N E S S E T H:

WHEREAS, Declarant collectively own all land and improvements on certain real property situate at Albany Post Road, Town of Hyde Park, Dutchess County, New York, a portion of which premises are currently under lease to Franchise Realty Interstate Corp., and upon which there is a McDonald's restaurant, and which is described more fully in SCHEDULE "A" annexed, and

WHEREAS, Declarant wishes to permit adequate signage for the benefit of the operator of said McDonald's restaurant and consistent with the aesthetic values of the community,

NOW, THEREFORE, Declarant hereby establishes the following covenants and restrictions to run with the land in perpetuity, or until earlier terminated as hereinafter set forth:

1. Franchise Realty Interstate Corp., and/or its franchisee, the operator of the said McDonald's restaurant may erect and maintain a single free standing advertising sign bearing the name "McDonald's" or a service mark or trademark commonly used by McDonald's restaurants, or a combination thereof.

2. No such sign shall exceed thirty (30) square feet in size.

3. No such sign shall be constructed from any material other than wood, except that such sign may contain metal hangers or bolts.

-1-

LIBER 1552 PAGE 866          866

4. No such sign shall extend to a height greater than fifteen (15) feet from ground level.

5. No such sign shall be closer than fifteen (15) feet from the curb line on the easterly side of Albany Post Road.

6. No such sign shall contain an interior lighting system; lighting shall be from exterior lights only.

7. No such sign shall be constructed or maintained in violation of the Zoning Ordinance of the Town of Hyde Park as it may from time to time be amended or varied, or any other municipal ordinance, rule or regulation.

8. Nothing herein contained shall be deemed to limit or reduce the advertising signage currently in use upon the premises, nor shall it be deemed to limit or preclude directional or traffic signs currently in use or hereafter required.

9. Nothing herein contained shall be construed to limit signage upon premises owned by, leased by or in which Declarant, or either of them, may have an interest, other than that leased to Franchise Realty Interstate Corp. (McDonald's).

10. The right of enforcement of these covenants and restrictions by any proceeding at law or in equity, against any person violating or attempting to violate the same, shall be specifically granted to HAROLD MILLER, owner-lessor of the underlying land, his heirs and assigns, or CORNWALL-PARK PARTNERSHIP, its successors and assigns, or HAROLD L. MANGOLD or MARJORIE MANGOLD.

11. The covenants and restrictions with respect to size, location, height, construction materials and content of the advertising sign shall terminate upon the vesting of title to premises known and designated as 4 Mansion Drive, Hyde Park, New York, in any person other than HAROLD L. MANGOLD or MARJORIE MANGOLD or their heirs at law.

*4 Mansion Hyde Drive, Park N.Y.*

-2-

12.   Invalidation of any one of these covenants and restrictions by judgment or Court order shall in no way affect the validity of any other provisions, which shall remain in full force and effect.

13.   In the event that any governmental authority requires the modification of any provision contained in this Declaration, the Declarant reserves the right, to execute a Supplemental Declaration pursuant thereto.  ~~Execution of such instrument by either HAROLD MILLER or CORNWALL PARK PARTNERSHIP shall suffice for this purpose.~~

IN WITNESS WHEREOF, HAROLD MILLER and CORNWALL-PARK PARTNERSHIP have executed this document the day and year first above written.

_____          _____
                                          HAROLD MILLER

                                   CORNWALL-PARK PARTNERSHIP

                                   By: _____
                                       ARTHUR SCHWARTZ, General Partner

STATE OF NEW YORK )
                 )  SS:
COUNTY OF DUTCHESS) ·

On this 17th day of January, 1981, before me the subscriber personally appeared HAROLD MILLER, to me personally known, and known to me to be the same person described in and who executed the foregoing instrument, and he duly acknowledged to me that he executed the same.

_____
Notary Public

JUNE G. SEVERING
NOTARY PUBLIC, STATE OF NEW YORK
RESIDING IN DUTCHESS COUNTY
COMMISSION EXPIRES MARCH 30, 19 81

867

-3-

LIBER 1552 PAGE 867

*868*

SCHEDULE "A"

May 26, 1976

PORTION OF THE LANDS OF HAROLD MILLER

Beginning at a point in the easterly line of Route 9 the said point being the northwesterly

corner of the herein described parcel and being S 1° 03'50" E 83.64' from the northwesterly

corner of lands of Harold Miller and the southwesterly corner of lands of Joseph H. Measuda;

thence thru the lands of Harold Miller along the northerly line of the herein described parcel

S 88° 08'50" E 210.19' to the northeasterly corner of the herein described parcel being a

point in the westerly line of a future interior access road running in a north – south

direction within the proposed shopping center; thence still thru the lands of Harold Miller

along the easterly line of the herein described parcel along the westerly line of the above

mentioned future interior access road S 1° 03'50" E 130.00' to the southeasterly corner of

the herein described parcel being the point of intersection of the westerly line of the

above mentioned future interior access road with the northerly line of a future entrance

road from Route 9; thence still thru the lands of Harold Miller along the southerly line of

the herein described parcel along the northerly line of the future entrance road from

Route 9 following in part a portion of existing curb N 89° 30'40" W 184.94' and along

a curve to the right on a radius of 30.00' a distance of 30.38' to the southwesterly

corner of the herein described parcel being the point of intersection of the northerly line

of the abovementioned entrance road with the easterly line of Route 9; thence along the

westerly line of the herein described parcel along the easterly line of Route 9

N 1° 03'50" W 120.89' to the point or place of beginning and containing 0.64 acres

more or less.

Subject to a water line easement 10' in width granted to the Hyde Park Fire and Water

District, the location of said easement being shown on the accompanying plan.



STATE OF NEW YORK )
                   ) SS:
COUNTY OF DUTCHESS)

On this 27th day of January, 1981, before me
the subscriber personally appeared ARTHUR SCHWARTZ, General
Partner of CORNWALL-PARK PARTNERSHIP, to me personally known
and known to me to be the same person described in and who
executed the foregoing instrument and he duly acknowledged to
me that he executed the same.

_____
                Notary Public

STATE OF NEW YORK )
                   ) SS:
COUNTY OF DUTCHESS)

On this 28 day of January, 1981, before me
the subscriber personally appeared HAROLD MANGOLD, to me
personally known and known to me to be the same person described
in and who executed the foregoing instrument, and he duly
acknowledged to me that he executed the same.

_____
                Notary Public

DUTCHESS COUNTY CLERK'S OFFICE
RECEIVED ON THE 24 DAY OF FEB, 1981
AT 11 H 43 M A M. RECORDED IN
BOOK No. 1552 OF DEEDS
AT PAGE 865 AND EXAMINED

William R. Steinem CLERK

D/Agreement

ARTHUR C. GELLERT
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN DUTCHESS COUNTY
COMMISSION EXPIRES MARCH 30, 19 82

| 1981 | FILE NO. 899 |
|------|--------------|
| FEE PAID 16.00 | INDEXED BY CB |

869

-4-    LIBER 1552 PAGE 869

# EXHIBIT F



FEB 23 1998

One McDonald's Plaza
Oak Brook, IL 605~

Direct Dial:    630/623-6273
Facsimile:    630/623-3719

Z 351 459 ~~~
SPECIAL CERTIFIED MAIL
RETURN RECEIPT REQUESTED

February 9, 1998

Mr. Harold Miller
85 Market Street
Poughkeepsie, New York 12601
MR. ROBERT BADER
54 GARDEN St
POUGHKEEPSIE, N.Y. 12601

RE:    **HYDE PARK, NEW YORK**
**566 Albany Post Road**
**L/C:031-0570**
**File #4323**

Dear Mr. ~~Miller~~: Bader—

Reference is made to that certain Ground Lease dated June 8, 1976, as amended by agreements dated May 23, 1977 and May 30, 1980 (collectively the "Lease") by and between yourself, as Landlord, and McDonald's Corporation, a Delaware corporation, as Tenant, covering property at the above described address.

You are notified that McDonald's Corporation does hereby exercise its option to extend the term of the Lease upon the same terms and conditions for a period of ten (10) years commencing September 26, 1998 and expiring September 25, 2008.  The rent for the ten (10) year extension shall be paid as follows:

    September 26, 1998 to September 25, 2003 = $1,321.08 per month.
    September 26, 2003 to September 25, 2008 = $1,545.16 per month.
    (These amounts include $125.00 per month for the additional property.)

Would you kindly acknowledge the receipt of this letter by signing in the space provided below and returning the original to Mary L. Simms of this office in the envelope enclosed for your convenience.  You may retain the second copy for your records.

Thank you for your cooperation.

    Very truly yours,
    **McDONALD'S CORPORATION**

    *Catherine A. Griffin*
    *Assistant Vice President*
    *Legal Department*
    *Real Estate Practice Group*

Mr. Harold Miller
February 9, 1998
Page Two

RECEIVED this ___ day of ___ Feb ___, 1998.

By: _____, President
                    Harold Miller

Enclosure

cc:     Bill Flanagan - Bedminster Region - #929
        Donna Pedevillano - Bedminster Region - #929
        Anne McDevitt - Real Estate - 090

        **CERTIFIED MAIL RETURN
        RECEIPT REQUESTED
        Z  378  370  747**

        AMARIC, Inc.
        c/o R. L. Baxter
        54 Garden Street
        Poughkeepsie, New York  12601

# EXHIBIT G



**McDonald's**

McDonald's Corporation
One McDonald's Plaza
Oak Brook, Illinois 60523
Direct Dial Number (630) 623-3931
Fax Number (630) 623-5604

**SPECIAL CERTIFIED MAIL - RETURN RECEIPT REQUESTED**
(7004 2510 0001 7070 0114)

March 9, 2007

Hydric, Inc.
54 Garden Street
Poughkeepsie, NY 12601

Attention: Robert L Baxter

RE:   Hyde Park, NY
       566 Albany Post Road
       L/C: 031-0570, File #4323

Dear Mr. Baxter:

Reference is made to that certain Ground Lease dated June 8, 1976 as amended by Agreement dated May 23, 1977 and Agreement dated May 30, 1980 ("Lease") between Hydric, Inc., successor in interest to Harold Miller, as Landlord, and McDonald's Corporation, a Delaware corporation, successor by merger to Franchise Realty Interstate Corporation, an Illinois corporation, as Tenant, covering property at the above described address.

McDonald's Corporation exercises its option to extend the term of the Lease for a period of 10 years commencing September 26, 2008 and expiring September 25, 2018. The rent for period from September 26, 2008 through September 25, 2013 shall be $1,786.05 per month, and the rent from September 26, 2013 through September 25, 2018 shall be $2,045.00 per month.

In addition, all notices for the Tenant under the Lease should be sent to the following address:

McDonald's Corporation
One McDonald's Plaza
Oak Brook, Illinois 60523
Attention: Director - US Legal Department
(L/C: 031-0570 )

Would you kindly acknowledge the receipt of this letter by signing in the space provided below and returning the original to me in the envelope enclosed for your convenience. You may retain the second copy for your records.

Thank you for your cooperation.

Very truly yours,

**McDONALD'S CORPORATION**

*Martha A Lundin*

Martha A Lundin
Senior Counsel
U.S. Legal Department

Received this _____ day of _____, 2007

Hydric, Inc.
By: _____

Enclosures
cc: Janet ogalo / New York Metro Region
     Carol DeMarco / East Division

S:\HO\DEPT\Legal\USLEGAL\assetmgt\Division - East\031\0570 Hyde Park\Option Exercise Letter - Lease.doc



**CERTIFIED MAIL**

U.S. Postal Service    Molly Lundin #281
**CERTIFIED MAIL    RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

Hydric Banks, NY, AC 031-0570

**OFFICIAL USE**

| | | |
|---|---|---|
| Postage | $ $0.63 | 0521 |
| Certified Fee | $2.40 | 19 |
| Return Receipt Fee (Endorsement Required) | $1.85 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $4.88 | 03/09/2007 |

Sent To

Street, Apt. No.; or PO Box No.

City, State, ZIP+4

ATTN ROBERT L BAXTER
HYDRIC INC
54 GARDEN ST
POUGHKEEPSIE NY 12601

7004 2510 0001 7070 0114

STATES POSTAL SERVICE

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

ATTN ROBERT L BAXTER
HYDRIC INC
54 GARDEN ST
POUGHKEEPSIE NY 12601

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____    ☑ Agent   ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery
3-13-07

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

7004 2510 0001 7070 0114

PS Form 3811, August 2001    Domestic Return Receipt    102595-01-M-2509

# EXHIBIT H

**Town of Hyde Park Planning Board**
**4383 Albany Post Road**
**Hyde Park NY 12538**
**(845) 229-5111 Ext. 2**
**(845) 229-0349 Fax**



**AMENDED SITE PLAN RESOLUTION**
**Town Code 108-9.6**

**PARK PLAZA SITE PLAN**

**Date: November 15, 2006**                          **Moved By: Michael Dupree**
**Resolution: # 40-03B**                             **Seconded By: John Bickford**

"I move that the Planning Board approve the Amended Site Plan requested for the project entitled 'Park Plaza,' which received site plan approval from the Planning Board on November 2, 2005, in the form of the following resolution dated November 15, 2006 and subject to the following conditions listed at the end of this resolution."

WHEREAS, on November 2, 2005, the Planning Board of the Town of Hyde Park adopted a resolution of approval for site plan for the application entitled "Park Plaza," which was for approval to construct a stand-alone, two story, 8,000 square foot building and a stand-alone, one story, 6,515 square foot commercial building and related site improvements in an existing plaza; and

WHEREAS, during the course of construction of the two story building, several modifications were made to the site that are not in conformance with the approved site plan; and

WHEREAS, the Planning Board has worked with the site owner to document the modifications and has directed the applicant to submit an application for an amended site plan approval in order to obtain an accurate site plan that reflects the current conditions on the site; and

WHEREAS, in response to the modifications, the Planning Board deemed it necessary to refer the revisions to the Dutchess County Department of Planning and Development for a referral in accordance with General Municipal Law Section 239-m; and

WHEREAS, the Department of Planning and Development responded on two separate occasions with memos to the Board, dated September 15, 2006 and November 14, 2006; and

*WHEREAS,* the applicant submitted revised drawings in response to the county's initial memo and addressed a number of the comments contained in that memo; and

WHEREAS, the County Department of Planning and Development, in its November 14th memo reiterated some of its comments and   recommended that the Planning Board not grant the amended site plan approval unless and until certain conditions were met, said conditions as listed in the November 14, 2006 memo as follows:

1.      *The Planning Board should require that the applicant return to the Board, within a timeframe deemed appropriate by the Board, to review and conceptually approve a site plan for the remainder of the site;*

2.      *A buffer area should be provided between the internal roadway and the sidewalk system. This buffer area should include grass/groundcover and*

Modification 108.96 A(2)                                                          Site Plan

> *regularly spaced street trees, as described above* (as described in the County's memo); and

3.  *The 5 space employee parking lot located immediately east of the Children's Medical Group building should be removed and replaced with landscaping as per the previously approved site plan; and*

**WHEREAS,** if the Planning Board determines to act contrary to the recommendations of the County Department of Planning and Development, the Board would have to do so by a majority plus one of the full membership and must notify the County Department of Planning and Development of the reasons for its decision; and

*WHEREAS,* a use has been added to the facilities currently occupied by St. Francis Hospital, that use being a full day care center, with additional students being bused in and transported by vans and for which, at the request of St. Francis to the site owner, a play area was constructed without the prior knowledge or consent of the Planning Board; and

*WHEREAS,* the Board was also made aware that certain light poles on the site were installed without the knowledge or consent of the Board that do not comply with the current standards of the code and for which the site owner has yet to come into compliance; and

**WHEREAS,** the 5 space parking area on the east side of the Children's Medical Group is designated for employees only, which will keep traffic in and out of that lot to a minimum, thereby making it less likely to be the subject of conflict than if it were customer/client parking; and

**WHEREAS,** the Planning Board, after careful consideration of all of the facts and circumstances of this matter and after weighing all of the potential significant adverse impacts associated with the various changes made to the prior approved site plan, wishes to approve the amended site plan as detailed in the latest drawings prepared by Berger Engineering & Surveying dated 01/26/05, last revised 11/02/06.

**NOW THEREFORE BE IT RESOLVED, that the Planning Board of the Town of Hyde Park, under the authority granted to it in Section 108-9.1 of the Code of the Town of Hyde Park hereby approves, by a majority of the full Board plus one, the amended site plan prepared by Berger Engineering & Surveying dated 01/26/05, last revised 11/02/06, as submitted by this applicant, subject to the following conditions.**

1.  **The applicant/site owner shall return to the Board within six (6) months of the date of this resolution and shall submit to the Planning Board within that time a concept plan for the remainder of the site.  No further approvals for development, other than those specified in this resolution, shall be entertained or granted until the Board approves a full plan for development of the reminder of the site, complete with provisions for parking, landscaping, lighting, pedestrian and vehicle circulation, building elevations and colors, materials, etc.**

2.  **The applicant/site owner shall within sixty (60) days bring all of the light standards proposed in the amended site plan into compliance with the height limitations of the Town.**

Z:\Donna\Park Plaza Addition - BLDG#2\Site Plan Modification resolution 11-15-06 2 (2).doc

Modification 108.96 A(2)                                                    Site Plan

3. The applicant/site owner shall return to the Board for amended approval of the landscaping plan for Building 2. Such application shall be made prior to issuance of a certificate of Occupancy for Building 2.

4. The internal circulation road as shown on the amended site plans, Sheet 3, labeled "Proposed Site Plan for Professional Office Space," prepared by Berger Engineering & Surveying, dated 01/26/05, last revised on 11/02/06, shall be constructed as part of the approval for Building 2. Said road shall be fully completed and inspected and shall be made operational prior to the issuance of a Certificate of Occupancy for Building 2. Plans for the buffer area and sidewalks for the internal circulation road shall be submitted to the Planning Board for approval, after consultation with the Dutchess County Department of Planning and Development, and construction of such buffer area and sidewalks shall be completed prior to issuance of the Certificate of Occupancy for Building No. 2.

5. The concrete directional island and related improvements at the northern entrance road from Route 9 near McDonald's will be constructed as part of the Building 2 construction, and shall be completed prior to issuance of the Certificate of Occupancy for Building No. 2. The construction shall be conducted in such a manner as to allow ingress to the site during construction.

6. In the event that the traffic circulation at the facilities utilized by St. Francis pose a danger to either pedestrian or vehicular traffic within the site, the Board reserves the right to revisit the issue of the additional use and require the site owner to take additional measures to ensure safe and proper circulation. The Board shall notify in writing the site owner to direct him to return to the Board for consultation.

7. No improvements other than those identified in the amended site plan approved herein shall be constructed on the site without the express written approval of the Planning Board through the site plan approval process. Should any additional changes be determined to be necessary during the course of construction of Building 2, the site owner shall make such changes known to the Board prior to the construction/installation of said changes by applying for amended site plan approval.

_____ Mr. Groeninger
_____ Mr. Bickford
_____ Mr. Murphey
_____ Mrs.Mesuda
_____ Ms. Dexter
_____ Mr. Dupree
_____ Mr. McGann                    _____
                                    George McGann, Planning Board Chairman

# EXHIBIT I





McDonald's Corporation
One McDonald's Plaza
Oak Brook, Illinois 60523
Direct Dial Number (630) 623-3931
Fax Number (630) 623-5604

**SPECIAL CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

April 3, 2007

Hydric, Inc.
54 Garden Street
Poughkeepsie, NY 12601

Attention: Robert L Baxter

RE:     Hyde Park, NY
        566 Albany Post Road
        L/C: 031-0570, File #4323

Dear Mr. Baxter:

Reference is made to that certain Ground Lease dated June 8, 1976 as amended by Agreement dated May 23, 1977 and Agreement dated May 30, 1980 ("Lease") between Hydric, Inc., successor in interest to Harold Miller, as Landlord, and McDonald's Corporation, a Delaware corporation, successor by merger to Franchise Realty Interstate Corporation, an Illinois corporation, as Tenant, covering property at the premises located at the address shown above and described in the Lease ("Premises").

McDonald's Corporation exercises its option to purchase the Premises for the price of $165,000 as set forth in paragraph 17 of the Lease.

You will be contacted in the near future to advise you of the Escrow Agent who will be handling this closing. McDonald's Deed and Money Escrow Instructions and other necessary forms governing this transaction will be forwarded to you shortly. In addition, since a subdivision is most likely required in order for you to convey fee simple title to the Premises, there will be additional documents which you will need to execute for such purpose.

Would you kindly acknowledge the receipt of this letter by signing in the space provided below and returning the original to me in the envelope enclosed for your convenience. You may retain the second copy for your records.

Thank you for your cooperation.

Very truly yours,

**McDONALD'S CORPORATION**

*Martha A Lundin*

Martha A Lundin
Senior Counsel
U.S. Legal Department

Received this _____ day of _____, 2007

Hydric, Inc.

By: _____

Enclosures

cc:  Janet Ogalo / New York Metro Region
     Carol DeMarco / East Division

S:\HOLDEPT\Legal\USLEGAL\assetmgit\Division - East\0311\0570 Hyde Park\Option Exercise Letter - Purchase.doc

**CERTIFIED MAIL**

**7006 2760 0002 3389 1491**

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

U.S. Postal Service™
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $0.63 | 0521 |
| Certified Fee | $2.40 | 27 |
| Return Receipt Fee (Endorsement Required) | $1.85 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ | $4.88 | 04/03/2007 |

Sent To
ATTN ROBERT L BAXTER
Street, Apt. No.; or PO Box No.
HYDRIC INC
54 GARDEN ST
City, State, ZIP+4
POUGHKEEPSIE NY 12601

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

ATTN ROBERT L BAXTER
HYDRIC INC
54 GARDEN ST
POUGHKEEPSIE NY 12601

A. Signature
X ☐ Agent ☐ Addressee

B. Received by ( Printed Name )
C. Moncure
C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service lab)
7006 2760 0002 3389 1491

PS Form 3811, August 2001        Domestic Return Receipt        102595-01-M-2509

# EXHIBIT J



# H Y D R I C  I N C.

## PROPERTY MANAGERS - OWNERS
### 54 GARDEN STREET, POUGHKEEPSIE, NY 12601
### 845-471-1047          FAX 845-485-8764

May 5, 2007

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED
AND REGULAR FIRST-CLASS MAIL**

RECEIVED

MAY 0 8 2007

LEGAL DEPT.

McDonald's Corporation
1 McDonald's Plaza
Oak Brook, Illinois 60523
Attention: Martha A. Lundin,
              Senior Counsel U.S. Legal Department

Re:    Hyde Park, New York
       566 Albany Post Road
       <u>L/C: 031-0570, Your File No. 4323</u>

Dear Ms. Lundin:

    We are in receipt of your letter dated April 3, 2007, in which McDonald's Corporation ("McDonald's") purports to exercise "its option to purchase the Premises for the price of $165,000.00 set forth in paragraph 17 of the Lease."

    Be advised, however, that it is Landlord's position that the purported purchase option is null and void *ab initio* and unenforceable, because it violates, <u>*inter alia*</u>, New York's common law rule against unreasonable restraints on alienation of property. As a result, McDonald's has no right to purchase the Premises based on the invalid and unenforceable alleged option.

    This letter is written without prejudice to all of Landlord's rights and remedies, which are reserved in all respects.

Very truly yours,

*Robert L. Baxter*

Robert Baxter
President

# EXHIBIT K

03/06/2007  13:10   8454860681                    MCCABE  AND  MACK  LLP                PAGE  03
03/06/2007  13:24   845229     9                 HYDE  PARK

# Hydric, Inc.

*Property Managers – Owner*

March 2, 2007

IVED

MAR - 2 2007

TOWN OF HYDE PARK
PLANNING BOARD

Town of Hyde Park Planning Board
4383 Albany Post Rd.
Hyde Park, NY 12538

Dear Planning Board Members;

It has come to my attention the attorneys representing McDonalds Restaurant recently had appeared in front of the board.

Please be advised Hydric, Inc. is the owner of the property tax parcel ID#6064 02-965956-0000 in which McDonald's leases property.

McDonald's Restaurant has NO authority to be given information or appear to the Planning Board as it relates to the property.

Thank you for your cooperation in this matter.

Very truly yours,

Robert Baxter
President , owner

54 Garden Street  ·  Poughkeepsie, New York 12601
Phone (845) 471-1047 / Fax (845) 485-8764
www.baxterbuilt.com

# EXHIBIT L



**McDonald's**

McDonald's Corporation
One McDonald's Plaza
Oak Brook, Illinois 60523
Direct Dial Number (630) 623-3931
Fax Number (630) 623-5604

**SPECIAL CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

May 9, 2007

Hydric, Inc.
54 Garden Street
Poughkeepsie, NY 12601

Attention: Robert L Baxter

RE:    Hyde Park, NY
566 Albany Post Road
L/C: 031-0570, File #4323

Dear Mr. Baxter:

Reference is made to that certain Ground Lease dated June 8, 1976 as amended by Agreement dated May 23, 1977 and Agreement dated May 30, 1980 ("Lease") between Hydric, Inc., successor in interest to Harold Miller, as Landlord, and McDonald's Corporation, a Delaware corporation, successor by merger to Franchise Realty Interstate Corporation, an Illinois corporation, as Tenant, covering property at the above described address.

We are in receipt of your letter dated May 5, 2007 in which you have repudiated the purchase option McDonald's duly exercised on March 9, 2007. Please be advised that under settled New York law, a purchase option contained in a lease which is exercisable during the term of the lease and not after the lease expires and which is part of the lease and not separable from it, is enforceable and does not violate the Rule Against Perpetuities or the common law rule against unreasonable restraints on alienation. See, e.g. *Symphony Space v. Pergola Properties, 88 NY 2d 466, (Ct. App. NY 1996); Deer Crossing Shopping Center LLC vs. Stop & Shop Supermarket Company, 777 NYS 2d 211 (Sup. Ct. NY 2003)*. Your argument has no merit and your refusal to cooperate in the closing on this purchase option is a breach of the lease. You are required to cure this breach by cooperating in the subdivision and the closing, or you will be subject to civil liabilities including an action for specific performance and damages. We will of course seek our attorneys fees if we have to enforce this purchase option. We are already spending considerable monies on engineering, attorneys fees and otherwise in taking the action necessary to subdivide the property, which we will hold landlord responsible for as well.

Please be guided accordingly.

Very truly yours,

**McDONALD'S CORPORATION**

*Martha A Lundin*

Martha A Lundin
Senior Counsel
U.S. Legal Department

cc: Janet Ogalo / New York Metro Region          Dan McVeigh / New York Metro Region
    Carol DeMarco / East Division          Heather Smedsted / Litigation Group

S:\HO\DEPT\Legal\USLEGAL\assetmgt\Division - East\031\0570 Hyde Park\Demand Letter to Robert Baxter.doc